**YASSIN v. UNITED STATES.**

No. 46985.

Court of Claims.

March 1, 1948.

510

Ivor B. Yassin, pro se.

Robert H. Kirkwood, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen. (J. F. Mothershead, of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Justice, and LITTLETON, HOWELL, MADDEN and WHITAKER, Judges.

LITTLETON, Judge.

The defendant filed a demurrer to plaintiff's original petition and in his response thereto plaintiff filed a motion for leave to file an amended petition which was allowed, and an amended petition was filed. Defendant has filed a demurrer to the amended petition.

Plaintiff is a citizen of the United States. He is a professional engineer duly licensed under the laws of New York, of which state he is a resident and citizen.

In the caption of the petition plaintiff makes the United States the sole party defendant but in paragraph Second of the petition he sets forth "that this is an action brought by Plaintiff against the defendant [under 35 U.S.C.A. § 68 and certain other U. S. statutes] and its ally the Government of Great Britain [pursuant to certain international agreements as amended by the agreement dated March 27, 1946, effective January 1, 1942 (60 Stat. Part II, 1566), the Act of March 11, 1941, and Section 6 of the Act of October 31, 1942], to recover reasonable compensation for the manufacture by or for the United States or use by it of certain devices claimed to infringe United States Letters Patent to the Plaintiff No. 2,363, 767; United States technical design Copyrights Nos. 23003 and 23004; and United Kingdom Letters Patent to the Plaintiff No. 505813, relating to portable bridge structures and improvements thereof." This paragraph of the amended petition further states that "The copyrighted designs for the purpose of the suit within the jurisdiction of this Court [on the patents] may be considered as supplementary documentary exhibits to the patents." Plaintiff disclaims any attempt to include in his petitioin an alleged cause of action for infringement of his Design Copyrights and admits "that the copyrights are not subjects of suit within the jurisdiction of this Court."

The grounds of the demurrer to the amended petition are (1) that the court has no jurisdiction to entertain a suit against the Government of Great Britain; (2) that the court has no jurisdiction to entertain a suit against the United States for the alleged infringement or unauthorized use of a patent granted by the United Kingdom of Great Britain; (3) that the court has no jurisdiction to entertain a suit against the United States for alleged infringement of copyrights; and (4) that the court has no jurisdiction to hear and determine any claim growing out of or dependent upon an international agreement between the · Government of the United States and the Government of Great Britain.

In paragraph Third plaintiff alleges that the devices alleged to have infringed his United States and British patents were as follows:

(1) The spud pierheads (pierheads and docks used in the English Channel during the War for unloading ships) in combination with the floating roadways bridge system (pontoon bridges from the pierheads and docks to shore) of the artificial harbor, known as "Mulberry," used in the invasion of Normandy, France, in World War II, on June 6, 1944, by the allied forces of the United States and Great Britain. Photographs of these alleged infringing structures are attached to the amended petition.

(2) The portable army "Scissors" type bridge, consisting of the United States type and the British type, used during World War II for general purposes by the allied forces. Photographs of the portable "Scissors" type bridges used are attached to the amended petition.

(3) The material, means of connection of the units and the principle of variation of the load carrying capacity of the bridge structure known as the Bailey bridge utilized and used during World War II.

In paragraph Fifth of the amended petition plaintiif alleges in paragraphs (b) (1), (2) and (3), that the "Mulberry" bridge structures, the "Scissors" bridge and elements of the Bailey bridge are definite adaptations of the structures described in his United States and British patents in suit or are infringing equivalent structures. In paragraph (b) (1) the petition sets forth allegations as to "specific infringement details," and alleges that the part of the "Mulberry" comprising the

floating spud pierheads and connecting floating roadways made up of prefabricated, trussed bridge units connected together by pin joints and supported at these joints by pontoons, are equivalent adaptations to water of the bridge structures described and claimed in claims 1, 2, 3, 4, 6, and 8 of plaintiff's British Patent No. 505813, for Improvements in Portable Bridge Structures, and claims 2, 3, 4, 5, 8, and 9 of his U. S. Patent No. 2363767, for a portable bridge structure.

In paragraph (b) (2) of paragraph Fifth, plaintiff alleges (omitting details) that the Army "Scissors" bridge manufactured and used is described and claimed in an almost identical structure in claim 7 of his U. S. patent and shown in Figs. 3 and 8, and infringed said claim of this patent. Paragraph (b) (2) further alleges that "The British 'Scissors' bridge differs from the American bridge in being carried on a Valentine tractor tank unit [instead of a trailer truck] and instead of cables [used in connection with the American structure] uses a hydraulically operated lever to perform the operation of pivoting the two bridge roadway sections so that they form one continuous roadway. In view of the allied status of the United States and Great Britain and because of Ref. D [the National Inventors Council], available to be used by the Allies under lend lease, infringement of the British version is claimed on the U. S. patent. The infringements on the joint matter of Refs. A and B [the British and American patents] are claimed for all cases of this suit as a mutual liability of both American and British authorities due to their allied status and special war conditions of lend lease and other intercountry agreements."

In paragraph (b) (3) it is alleged that certain features of the Bailey bridge, which are detailed in the amended petition, infringed claims 2 and 4 of the British patent and claim 5 of the U.S. patent, in that these claims and the patent specifications set forth the essential ideas from which the alleged infringing features could have been taken. Upon information and belief plaintiff alleges that knowledge of his structures was the basis for the incorporation of his particular principles in the Bailey bridge and that such bridge constitutes an infringement as an equivalent structure insofar as those features are concerned. It is alleged that the structures disclosed and claimed in his patents contain all the features of the infringing Bailey bridge structures.

In paragraph Fourth the petition alleges that plaintiff attempted to interest the military departments concerned, of both the United States and Great Britain, with the development and use of such structures as are described and covered in and by the United States patent and copyrights and the British patent; that from a time in 1938, shortly after the first filing of the patent applications until the outbreak of war in Europe on September 1, 1939, and subsequently, he engaged in correspondence with and submitted material for study to the military departments concerned of the United States and Great Britain, with the result that plaintiff's inventions were then rejected.

In section (a) of paragraph Fifth of the petition, it is alleged that plaintiff first approached the U. S. Corps of Engineers in the summer of 1938, with the proposal that the War Department utilize the structures and principles described in the then pending U. S. Patent Application, Serial No. 178829, filed December 8, 1937. As a result of correspondence plaintiff submitted further details for examination, after which plaintiff's invention was rejected in a letter dated November 1, 1938, from the Chief of Engineers, U. S. Army, which stated in part as follows:

* * * In military operations the transportation of supplies and materials is an enormous problem and it is mandatory that all but the most essential supplies and materials be eliminated from consideration and every effort made to utilize local materials.

I regret that the above consideration does not permit provision for a portable, vehicle bridge crossover in military equipment * * *.

There is no allegation in the petition as to the date on which plaintiff's U. S. Patent No. 2363767 was granted and issued.

While the British Patent Application No. 22271/38 was pending in 1938 and 1939, the British War Office expressed interest in the structure described therein. In the ensuing correspondence between plaintiff and the War Office, a number of clarifying descriptive details were forwarded by plaintiff to the British War Office for study, including photographs of a plastic stress analysis model and plans copyrighted in the United States. After some time the British War Office rejected plaintiff's invention in a letter dated January 24, 1939, and upon further inquiry by plaintiff the War Office wrote him on July 13, 1939, stating in part that "* * * It was found after fully investigating the additional information submitted, that the proposal was unlikely to meet requirements for active service conditions * * *."

In 1942, after this country had entered the War, the plaintiff, believing that the structures covered by his inventions would be useful in carrying on the War, submitted to the National Inventors Council all possible information which he had, including improvements and details, then held in secret by the United States Patent Office.

The phraseology of the several claims of the patents alleged to have been infringed are not set forth in the petition, and copies of the patents sued on were not filed with the petition.

With the approach of the conclusion of the war in Europe and after hostilities had ceased there were released various details of certain items of equipment which had been used, but theretofore held in secret. In May 1944 plaintiff was apprised by such release of some of the details of the Bailey bridge. In June, and November, 1945, plaintiff was apprised of the "Mulberry" structures and "Scissors" bridge and their use in and during the invasion of France, by articles in certain publications in the United States. Upon the acquisition of this information plaintiff, by letters, protested to the U. S. War and Navy departments, and to the British Ministry of Supply Mission, that his patents had been infringed.

In paragraph Seventh plaintiff alleges that he made application to the U. S. departments concerned, requesting general information with reference to clarifying details of the "Mulberry" bridge units and the "Scissors" bridge, helpful in drafting his petition for claimed infringement, and that his request for such information was denied.

The foregoing states the pertinent allegations of the petition material to the questions raised by the demurrer.

At the outset it should be noted that insofar as plaintiff's U. S. Patent No. 2363767, for a portable bridge, is concerned, the amended petition contains no clear allegation as to whether all or any of the structures alleged to infringe this patent were manufactured by or for the United States within this country or whether any of them were used by it within the territorial limits of the United States, within the meaning of the patent jurisdictional statute of June 25, 1910, as amended, 35 U.S.C.A. § 68. The petition does not state when this patent was issued, nor does it allege whether the invention was ordered held in secret and the grant of the patent withheld in the manner prescribed by the Act of July 1, 1940, 54 Stat. 710, 35 U.S.C.A. § 42. The petition does not allege where or during what period the alleged infringing structures were manufactured and the only use alleged is a use outside the territorial limits of the United States and within the territorial limits of France, in which country plaintiff had no patent. We do not know whether the alleged infringing structures were manufactured by or for the United States in this country for sale, transfer, exchange, lease, lend or other disposition to Great Britain under Sections 2 and 3 of the National Defense Act, commonly called the Lend-Lease Act, of March 11, 1941, 55 Stat. 31, 22 U.S.C.A. §§ 411, 412, or whether the alleged infringing structures were manufactured by or for Great Britain within or outside the territorial limits of the United States.

The only allegations with reference to manufacture and/or use are contained in paragraph Second of the petition which states only that the suit is brought against the United States and its ally the Govern-

ment of Great Britain, to recover compensation for the manufacture by or for the United States or use by it of certain devices claimed to infringe plaintiff's United States and British patents, relating to portable bridge structures and improvements thereof, and paragraph Third which states only that the "Mulberry" structures were used on June 6, 1944, in the invasion of Normandy in World War II, and that the "Scissors" bridge and the Bailey bridge structures were used for general purposes by the allied forces during World War II.

Plaintiff says that the demurrer should be overruled and relies upon the provisions of the Act of March 11, 1941, supra, particularly section 7 thereof; the Act of October 31, 1942, The Royalty Adjustment Act, particularly section 6 thereof, 56 Stat. 1013, 35 U.S.C.A. §§ 89–96, and an International Executive Agreement, as amended, relating to "interchange of patent rights, information, inventions, designs, or processes," between the United States and the United Kingdom of Great Britain and Northern Ireland, Aug. 24, 1942, effective January 1, 1942, Executive Agreement, Series 268, 56 Stat. Par II, 1594; and Treaties and Other International Acts, Series 1510, 60 Stat. Part II, 1566.

Plaintiff contends that these acts and the agreement amended and enlarged the jurisdiction conferred upon this court under the Act of June 25, 1910, as amended by the Act of July 1, 1918, 35 U.S.C.A. § 68.

■ We cannot agree with plaintiff that the acts and the agreement referred to had the effect of extending or enlarging the jurisdiction of this court in respect of patent infringement suits under Section 68, U.S.C.A., Title 35, so as to embrace the matters and claims of the amended petition to which the demurrer is directed. This section provides that "Whenever an invention described in and covered by a patent of the United States shall hereafter be used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, such owner's remedy shall be by suit against the United States in the Court of Claims for the recovery

of his reasonable and entire compensation for such use and manufacture * * *."

■ Under this section the United States may be sued only on a United States patent for the unauthorized manufacture or use thereof. Obviously it cannot be sued under the section for the infringement of a foreign patent, and we find no other general or special law under which it has consented to be sued for infringement of such a patent.

Insofar as plaintiff believes that the United States has infringed his U. S. Patent No. 2363767, in manufacturing or having manufactured for its use in the United States or for sale, transfer, lease, lend, or other disposition under the provisions of the Lend-Lease Act of March 11, 1941, supra, a petition alleging such infringement, in such manner as to comply with Section 159 of the Judicial Code, 28 U.S.C.A. § 265, and Rule 10 of this court, 28 U.S.C.A. following section 263, would not be subject to demurrer. Brothers v. United States, 250 U.S. 88, 39 S.Ct. 426, 63 L.Ed. 859.

We shall first discuss the provisions of the Lend-Lease Act and the Executive Agreement between the United States and Great Britain.

No provision is found in the Lend-Lease Act of March 11, 1941, which expressly extends or enlarges the jurisdiction of this court so as to embrace cases of alleged infringement which do not come within the terms of the Act of June 25, 1910, as amended, 35 U.S.C.A. § 68, and we think it is clear from a reading of the act that Congress did not intend by any provision therein to consent to be sued for infringement of a foreign patent. The only reference to the purpose intended to be accomplished by section 7 of that act is contained in Report No. 18 of the Committee on Foreign Affairs of the House, January 30, 1941, on H.R. 1776, p. 10, as follows: Section 7 requires the Secretary of War, the Secretary of the Navy, and the head of any other department or agency concerned to make provision for safeguarding the rights of citizens of the United States who have patent rights in any defense article or defense information transferred to a foreign Government.

Section 7 of the Act of March 11, 1941, provides as follows: "The Secretary of War, the Secretary of the Navy, and the head of the department or agency shall in all contracts or agreements for the disposition of any defense article or defense information fully protect the rights of all citizens of the United States who have patent rights in and to any such article or information which is hereby authorized to be disposed of and the payments collected for royalties on such patents shall be paid to the owners and holders of such patents."

The report of the Senate Committee on Foreign Relations on the Act of March 11, 1941, shows only that section 7 was taken from and is in substance the same as section 6 of Joint Resolution No. 83 of June 15, 1940, "To authorize the Secretaries of War and of the Navy to assist the governments of American republics to increase their military and naval establishments, and for other purposes" 54 Stat. 396, 22 U.S.C.A. § 526, as follows: "The Secretary of War and the Secretary of the Navy shall in all contracts or agreements for the sale of such matériel fully protect the rights of all citizens of the United States who have patent rights in and to any such matériel which is hereby authorized to be sold and the funds collected for royalties on such patents shall be paid to the owners and holders of such patents."

 The extent to which the United States would be subject to suit and liable for compensation for infringement of a U. S. patent under the provisions of the act of 1910, would depend upon the circumstances under which the article alleged to infringe was manufactured and/or used. If manufactured by or for the United States in this country for disposition under the Lend-Lease Act, it would be liable for payment of compensation under the Act of June 25, 1910, as amended, but if manufactured by a United States contractor under an independent contract with Great Britain or an authorized agency of that Government, to which the United States was in no way a party, then the contractor rather than the United States would be subject to suit as the infringer of the United States patent. A United States patent does not cover manufacture and/or use in another country, 35 U.S.C.A. § 40; Grissinger v. United States, 77 Ct.Cl. 106, and, likewise, the monopoly of a foreign patent does not extend to the United States and its Territories.

Following the approval of the Lend-Lease Act of 1941, the United States and the Government of the United Kingdom of Great Britain entered into a preliminary agreement respecting the principles applying to mutual aid in the prosecution of the war against aggression, dated February 23, 1942, Executive American Series 241, 56 Stat. Part II, 1433, 34, Article IV of which was as follows: "If, as a result of the transfer to the Government of the United Kingdom of any defense article or defense information, it becomes necessary for that Government to take any action or make any payment in order fully to protect any of the rights of a citizen of the United States of America who has patent rights in and to any such defense article or information, the Government of the United Kingdom will take such action or make such payment when requested to do so by the President of the United States of America."

Plaintiff says, however, that section 7, supra, was the main basis for the Patent Interchange Agreement, effective January 1, 1942, between the United States and Great Britain, which was intended by section 7 to detail the responsibilities of each Government for the protection of the patent rights of their respective nationals; that said section 7 is the specific enabling Congressional enactment which allows the terms of such Patent Interchange Agreement to give this court the necessary jurisdiction to hear and determine the claims set forth in plaintiff's amended petition. On this premise plaintiff argues that it is through the Patent Interchange Agreement, based on the Lend-Lease Act of 1941, that the jurisdiction of this court is extended to hear and determine a suit for the use of a British patent by the United States and the use of a United States patent by Great Britain; and that under such agreement so founded upon the Lend-Lease Act, this court is empowered to hear and determine

a suit against Great Britain as a coparty with the United States.

We cannot agree with plaintiff that section 7 of the Lend-Lease Act and the Patent Interchange Agreement referred to, had or were intended to have the effect of enlarging the existing jurisdiction of this court under Title 35, U.S.C.A., § 68, in respect of suits for patent infringement.

No language is to be found in section 7, or in any other provision of the Lend-Lease Act of 1941, evidencing an intent by Congress to confer additional jurisdiction upon this court and, since no additional jurisdiction was conferred, the agreement between the executive departments of the Government of the United States and the Government of the United Kingdom of Great Britain, could not effectively deal with that subject.

■ It is not necessary here to discuss the full import of section 7 further than to say that in our opinion it did not, as we think its language shows, relate to or authorize suit for patent infringement against the United States or any one else which could not be maintained under existing law. Instead, the section related entirely to contracts or agreements, not between citizens of the United States and the United States Government but between the executive departments of the United States and foreign governments, concerning patent rights which Congress directed such departments to safeguard when disposing of any defense article or defense information to such foreign governments. Following this, the section, instead of providing that a citizen of the United States might sue the United States on a foreign patent or sue a foreign government in this court on a U. S. patent or a foreign patent, clearly stated that any amounts determined to be due American citizens for "patent rights in and to any such [defense] article or [defense] information," from such foreign governments under the terms of such contracts, and collected by the United States, should be paid over by the United States to the owners and holders of such patents. It may be assumed that section 7, by referring to "patent rights" of "all citizens of the United States," included all patent

rights, liquidated or unliquidated, of such persons under United States patents and also under foreign patents issued to American citizens by the foreign government concerned, but the section required that the full protection specified be provided by and enforced through international contracts or agreements, since no right was given to sue on any claim arising under or growing out of such agreements. See Section 153, Judicial Code, 28 U.S.C.A. § 259.

■ Whatever right plaintiff had under existing law to sue the United States in this court for infringement of his U. S. patent and whatever right he had to sue Great Britain in the courts of that Government for infringement of his British patent, remained unimpaired and unchanged by the Lend-Lease Act of March 11, 1941.

The foregoing conclusions as to the purpose and effect of section 7, are supported by the terms and conditions of the Patent Interchange Agreement, dated March 27, 1946, effective January 1, 1942, supra, which agreement was concerned with (1) the matter of procuring and furnishing by each Government to the other, for national defense and war production, patent rights, information, inventions, designs, or processes (arts. I, II, III, IV and V); (2) subject to certain limitations, the matter of indemnity from the Government of the United Kingdom to the United States against claims asserted by nationals of the United Kingdom under any United States patents for the use of any method or process and for the manufacture, use, or disposition of any article, which method, process, or article was used, manufactured, or disposed, of by the United States to the Government of the United Kingdom for war purposes under Article II, or for Lend-Lease, or on request (arts. VI and VII); and (3) subject to certain exceptions and limitations, the matter of similar indemnity from the United States to the Government of the United Kingdom against claims asserted by nationals of the United States under United Kingdom patents or registered designs similarly used, manufactured, or disposed of by the United Kingdom under Article II, or in connection with the supply of articles to the United

States under Reciprocal Aid, or pursuant to request of the United States (art. VIII).

Articles VII(b) and (d), and IX(b) and (d), show that any claim in respect of which each Government promised to indemnify the other would be disposed of by the indemnifying Government "through negotiations with the claimant," except to the extent that any claim not so disposed of should become "the subject of legal proceedings in the United States Court of Claims or other appropriate United States court * * *" (art. VII(d), or should become "the subject of legal proceedings in the appropriate United Kingdom court or other tribunal * * *" (art. IX(d), in which event the indemnifying Government would satisfy any judgment rendered against the other Government in such proceedings.

The legal proceedings referred to were obviously proceedings in the courts mentioned under their existing lawful jurisdiction. Subjects of Great Britain having a United States patent, may sue the United States in this court under Section 155 of the Judicial Code, 28 U.S.C.A. § 261, for infringement of his patent, and under similar authority of British law a citizen of the United States owning a British patent may sue the Government of the United Kingdom in the appropriate United Kingdom court.

Article X(a) of the agreement provided so far as here material that "* * * the indemnity set forth in Articles VI, VII, VIII, and IX of this Agreement shall inure only to the benefit of the respective Governments. * * *"

Article XII provided as follows: Anything contained in this Agreement to the contrary notwithstanding, any obligations heretofore or hereafter undertaken by the Government of the United Kingdom pursuant to the provisions of Section 7 of the Act of the Congress of the United States approved March 11, 1941 (Public 11, 77th Congress), as amended, as such obligations may be interpreted by the President of the United States of America or by a United States court of competent jurisdiction, shall be performed by the Government of the United Kingdom.

Article XV provided as follows: A joint committee of representatives of the Government of the United States of America and of the Government of the United Kingdom shall be established for the purpose of dealing with problems arising in connection with operations under this Agreement and of making appropriate recommendations to proper authorities with respect thereto.

█ Since it is clear that under existing law no right has been given plaintiff to sue the United States in this court for infringement of a foreign patent, ground 2 of defendant's demurrer must be sustained. Since plaintiff is not suing for alleged infringement of U. S. Copyrights, no decision is required on ground 3 of the demurrer. As to the fourth ground of the demurrer, it is clear from the provisions of the Patent Interchange Agreement, as amended, and the provisions of Section 153 of the Judicial Code, 28 U.S.C.A. § 259, that this court is without jurisdiction to adjudicate any claim growing out of or dependent upon any of the provisions of that agreement.

█ In further answer to the first ground of defendant's demurrer plaintiff cites and relies upon Section 6 of the Act of October 31, 1942, 56 Stat. 1013, 1014, 35 U.S.C.A. § 94, known as the Royalty Adjustment Act, as sustaining a cause of action against the United States as the responsible party in the matter of infringement of a United States patent by one of its authorized agents and against its co-defendant, the Government of the United Kingdom of Great Britain, as the agent of the United States. Plaintiff argues that the act of 1942, supra, serves to strengthen the effectiveness of the Lend-Lease Act of March 11, 1941, and the Patent Interchange Agreement, as amended, as applied to this case, in protecting the rights of a United States patentee against infringement by other parties acting for the United States by making it liable to a suit in this court for their infringement. Plaintiff, therefore, insists that the Government of the United Kingdom of Great Britain and its contractors come within the category of persons or parties enumerated in said

section 6, for whose acts of infringement the United States is made liable, and that the latter part of section 6 contains language which extends the jurisdiction of this court to hear and determine a claim based in part on the infringement of a United States patent by Great Britain.

In view of the provisions and purposes of the Royalty Adjustment Act of 1942, as disclosed by the language thereof and by the reports of the Congressional committees in charge of the bill S.2794 (Rept. No. 1640, Sen. Comm. on Patents, Oct. 14, 1942, and Rept. No. 2602, House Comm. on Patents, 77th Cong. 2d sess.). we are of the opinion, as hereinbefore held with respect to the Lend-Lease Act and the Patent Interchange Agreement, that section 6 of the 1942 Act cannot be interpreted on the allegations of the petition so as to have the effect for which plaintiff contends. Under the express terms of the Act the manufacture, use, sale or other disposition of an invention must be "for the Government and with the authorization or consent of the Government" before the United States can be held liable by suit.

This section, 35 U.S.C.A. § 94, provides as follows: "For the purposes of this Act, the manufacture, use, sale, or other disposition of an invention, whether patented or unpatented, by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government shall be construed as manufacture, use, sale, or other disposition for the United States and for the purposes of the Act of June 25, 1910, as amended (40 Stat. 705, 35 U.S.C.A. § 68), the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

The meaning of section 6 and the extent to which it amends the existing Jurisdictional Act of June 25, 1910, as amended, must be determined by considering the other provisions of the act of which it is a part and to which it relates.

The main purpose of the Royalty Adjustment Act was to provide for the adjustment of patent royalties provided for under existing license agreements for the use of inventions, whether patented or unpatented, for the benefit of the United States, in aid of the prosecution of the war. Section 1, 35 U.S.C.A. § 89, provides that whenever an invention "shall be manufactured, used, sold, or otherwise disposed of *for the United States,* with license from the owner thereof or anyone having the right to grant licenses thereunder, and such license includes provisions for the payment of royalties the rates or amounts of which are believed to be unreasonable or excessive by the head of the department or agency *which has ordered* such manufacture, use, sale, or other disposition, the head of the department or agency of the Government concerned shall give written notice of such fact to the licensor and to the licensee" [Italics supplied]; that the head of the department or agency concerned shall give written notice of such fact and "shall by order fix and specify such rates or amounts of royalties, if any, as he shall determine are fair and just, taking into account the conditions of wartime production, and shall authorize the payment thereof by the licensee to the licensor on account of such manufacture, use, sale, or other disposition." This section further provides that the "licensor's sole and exclusive remedy, except as to the recovery of royalties fixed in said order, shall be as provided in section 2", 35 U.S.C.A. § 90. Section 2 authorizes suit against the United States in this court or the District Court, "to recover such sum, if any, as, when added to the royalties fixed and specified in such order, shall constitute fair and just compensation." Section 3, 35 U.S.C.A. § 91, authorizes the department or agency concerned to enter into an agreement, with the owner or licensor, whether or not an order has been made, and before suit, in full settlement and compromise of any claim against the United States and for future compensation for such manufacture, use, sale, or other disposition, ordered by and for the United States. Section 4, 35 U.S.C.A. § 92, provides that when a reduction in rates or

amounts of royalties is affected by order or agreement such reduction shall inure to the benefit of the Government by way of a corresponding reduction in the contract price to be paid, directly or indirectly, by the United States for such manufacture, use, sale, or other disposition of such invention, or by way of refund if already paid to the licensee.

Section 7, 35 U.S.C.A. § 95, provides that the act shall apply to all royalties directly or indirectly charged or chargeable to the United States for any supplies, equipment, or materials to be delivered to or for the United States after the effective date of the order under section 1, and to all such royalties for such supplies already so delivered, which royalties have not been paid to the licensor prior to the effective date of such order.

Plaintiff had no license agreement with any one providing for payment of a royalty under his U. S. patent and, therefore, none of the provisions of the act relating to that matter has any application to his claim. He does not seek to apply any of the provisions of the act to his British patent. He apparently seeks only to sue the United States and Great Britain jointly and to hold them jointly liable for the alleged infringement of the United States patent under the language of section 6, supra, on the theory, apparently, that some sort of an agency arrangement, not alleged in the petition, may have existed between the United States and Great Britain in connection with a contract or contracts for war supplies which Great Britain may have directly made with a contractor in this country for the manufacture, sale or delivery to it with the authorization and consent of the United States of articles, supplies, or materials, under the terms of the Lend-Lease Act.

As we have hereinbefore held, in our discussion of the Lend-Lease Act, the monopoly of a U. S. patent does not cover a manufacture or use in a foreign country, and no right exists to sue any Government other than the United States in this court. We can find nothing in the Act of October 31, 1942, supra, which, in any way, changes or modifies this rule of law. The first part of section 6 of that Act deals, as we have shown, with existing license agreements for payment of patent royalties and has no application here. The latter portion of this section, beginning with the words "and for the purposes of the Act of June 25, 1910," was, in our opinion, intended only to enumerate the classes of persons who, whether contractors, subcontractors or materialmen, would not be subject to direct suit for infringement of a U. S. patent when engaged in manufacturing or using an invention "for the Government and with the authorization or consent of the Government," whether such contractor, subcontractor, or any person, firm or corporation had or did not have a license including provisions for the payment of royalties.

Any right which plaintiff may have to recover compensation for infringement of his U. S. patent in this country by Great Britain and/or its contractors, unless the United States was a party to such contracts or agreed to pay for the articles to be manufactured and/or delivered to Great Britain, would have to be enforced by suit against such contractor in the appropriate District Court or prosecuted through the Executive Department of the United States under the terms of the Patent Interchange Agreement, made under Section 7 of the Lend-Lease Act.

This interpretation of section 6 is supported by the explanation of the intent and purpose of the section by the Senate Committee on Patents in its Report No. 1640, supra. On page 1, the Committee stated that one of the purposes of the bill was "To clarify existing legislation, namely, the Act of June 25, 1910, as amended, * * * with respect to contractors and subcontractors manufacturing and using inventions for the Government." On page 2, the Committee explained the necessity for the royalty adjustment provisions, in part, as follows:

In recent months it has become apparent that procurement costs of material in certain instances include exorbitant royalties under already existing patent licenses. The principal motive of the bill is to remedy such situations.

Our courts have held that the Act of 1910, as amended, does not apply where an invention is furnished for use of the United States by the licensee under a patent and is no defense to a suit by the owner of the patent against the licensee for royalties. Newport News Shipbuilding & Dry Dock Co. v. Isherwood et al., 1925, 5 F.2d 924, certiorari denied, 269 U.S. 592, 46 S.Ct. 13, 70 L.Ed. 429.

On page 5, the report sets forth the purpose and intent of certain Committee amendments, including the latter portion of section 6, as follows: Although S. 2794 as introduced was prepared by the War Department in cooperation with the Navy Department, the Department of Justice and the Department of Commerce, representatives of the War Department appeared before the committee, recommended certain amendments to the bill, and explained the necessity therefor. It was pointed out by such representatives of the War Department that since the bill was introduced certain information has come to the attention of that Department which demonstrates the necessity for broadening the scope of the bill (1) to cover royalties charged to the United States directly or indirectly on unpatented foreign or other inventions, as well as inventions described in patents granted by the United States or in applications therefor; (2) to include reductions in royalty rates for supplies, equipment, or materials produced or delivered for the Government by subcontractors or subordinate contractors or which form parts of completed articles for which the Government pays or is chargeable as a portion of the cost under prime contracts; (3) to clarify the language of the bill as introduced to show definitely that modification of the act of June 25, 1910, as amended, is intended only so far as the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm or corporation acting for the Government with its authorization or consent, shall be construed as use or manufacture for the United States; (4) to extend the application of the bill to all royalties on supplies, equipment, or materials to be delivered to some one other than the United States for the Government, as well as to deliveries made directly to the United States, and to royalties unpaid at the time of enactment of the bill as well as to those which become payable thereafter; * * *

It will be seen from the foregoing explanation in (3) as to the limitation intended to be imposed by the latter part of section 6 on any possible modification of the Act of June 25, 1910, as amended, by other provisions of the act of which the section is a part, that it is only in those cases where an invention covered by a U. S. patent is used or manufactured for the United States and with its authorization and consent, that a use or manufacture may be construed as being for the United States for the purpose of suit in this court. In such case the United States is the only party who may be sued.

Since no right has been given in either the Lend-Lease Act of 1941, or in the Royalty Adjustment Act of 1942, to make the Government of the United Kingdom of Great Britain a party defendant in a suit in this court, ground 1 of the demurrer must, also, be sustained.

The defendant's demurrer is, therefore, sustained and the amended petition is dismissed in all respects except as to the claim made therein against the United States under the Act of June 25, 1910, as amended, for alleged infringement of plaintiff's U. S. Patent No. 2363767, and plaintiff will be allowed 60 days within which he may file an amended petition conforming with the provisions of Section 159 of the Judicial Code, 28 U.S.C.A. § 265, and Rule 10 of this court. Otherwise the petition will be dismissed. See Section 165 of the Judicial Code, 28 U.S.C.A. § 273. It is so ordered.

JONES, Chief Justice, and HOWELL, MADDEN and WHITAKER, Judges, concur.