**UNITED STATES v. YOUNGSTOWN SHEET & TUBE CO. et al.**

No. 10780.

United States Court of Appeals
Sixth Circuit.

Dec. 6, 1948.

Roy C. Hackley, Jr., of Washington, D. C. (H. G. Morison and Roy C. Hackley, Jr., both of Washington, D. C., and Don C. Miller, of Cleveland, Ohio, on the brief), for appellant.

Howard F. Burns and Frank Harrison, both of Cleveland, Ohio, for appellees.

Howard F. Burns and Baker, Hostetler & Patterson, all of Cleveland, Ohio, William H. Webb and Stebbins, Blenko & Webb, all of Pittsburgh, Pa., Clarence B. Zewadski and Whittemore, Hulbert & Belknap, all of Detroit, Mich., and Franklin B. Powers and Manchester, Bennett, Powers & Ullman, all of Youngstown, Ohio, for Cold Metal Process Co., and Union Nat. Bank of Youngstown, Ohio, trustee of the Leon A. Beeghly Fund.

Leland K. Neeves and Scott, MacLeish & Falk, all of Chicago, Ill., and Andrew P. Martin, Frank Harrison and Squire, Sanders & Dempsey, all of Cleveland, Ohio for Signode Steel Strapping Co.

John B. Putnam and Andrews, Hadden & Putnam, all of Cleveland, Ohio, and Cravath, Swaine & Moore, of New York City, for Youngstown Sheet & Tube Co. and Bethlehem Steel Co.

Andrew P. Martin, Frank Harrison and Squire, Sanders & Dempsey, all of Cleveland, Ohio, and Breed, Abbott & Morgan, of New York City, for Armco Steel Corporation (name formerly American Rolling Mill Co.)

W. C. Plummer, of Pittsburgh, Pa., and T. F. Veach and Jones, Day, Cockley & Reavis, of Cleveland, Ohio, for Jones and Laughlin Steel Corporation.

W. A. McAfee, and McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, all of Cleveland, Ohio, for Wheeling Steel Corporation.

Hershey, Donaldson, Williams & Stanley, of Baltimore, Md., for Crown Cork & Seal Co., Inc.

Harry W. Lindsey, Jr., and Davis, Lindsey, Hibben & Noyes, all of Chicago, Ill., for Inland Steel Co.

H. E. Hackney and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., for Crucible Steel Co. of America.

Smith, Buchanan & Ingersoll, of Pittsburgh, Pa., for Allegheny Ludlum Steel Corporation and Wallingford Steel Co.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

This appeal presents the direct question: Does the Royalty Adjustment Act of October 31, 1942, U.S.C.A., Title 35, §§ 89–96, apply to payments of money made in settlement of claims for damages for past infringement of patents? The district court held that sums aggregating $9,749,000 so paid and on deposit in the registry of the court are not "royalties" and are, therefore, not within the purview of the Royalty Adjustment Act.

The United States has appealed from the denial of its motion for a preliminary injunction impounding, pendente lite, the aforementioned amount in the court registry. The district court ordered its clerk to pay over the impounded funds to the trustee, which had succeeded to the rights of the owner of the patents.

The order also overruled separate motions of two of the manufacturers who had settled for infringement, seeking inhibition of the distribution to the trustee of any part of the sums deposited by each into the registry of the court. It was decreed that the payment to the trustee of the $9,749,000 should constitute a full discharge of the defendant manufacturers from any claim by the United States that the various amounts paid by each, aggregating the total sum in the registry of the court, "were in any respect affected by the Royalty Adjustment Act or any notices or orders purporting to have been made thereunder." The complaint of the United States, as amended, insofar as it sought to recover the moneys on deposit in the registry or equivalent amounts from the defendant manufacturers, was dismissed.

A bit of background touching this case may be helpful to an understanding of how the present issue has been reached. In United States v. Cold Metal Process Company, D. C., 62 F.Supp. 127, the United States, upon grounds of fraud or mutual mistake, sought cancellation of two Steckel patents pertaining to the rolling of metal. The patents were owned by the Cold Metal Process Company. After trial of that case, District Judge Miller (now a member of this court) dismissed the complaint of the

United States; and his judgment was affirmed by this court. 6 Cir., 164 F.2d 754, certiorari denied 334 U.S. 811, 68 S.Ct. 1016, rehearing denied 334 U.S. 835, 68 S.Ct. 1343.

Before the trial of the attempted patent-cancellation case, the district court, by an order dated October 9, 1944, enjoined Cold Metal Process Company, until entry of final judgment, from collecting or receiving any moneys from royalties, settlement of claims, judgments for damages, or otherwise, on account of the two Steckel patents, and from undertaking to collect any payments by virtue of the patents. The order expressly permitted the reduction of claims to judgment and the effectuation of settlements, upon the express condition, however, that any moneys so received should be deposited with the clerk of the court to await further orders of court. The Cold Metal Process Company was also enjoined from distributing to its stockholders any moneys received by way of royalties, payments in settlement of claims, satisfactions of judgments, or otherwise, on account of the patents. The express purpose of this interlocutory order as recited therein was to preserve the status quo pending the trial of the case.

Between the end of December, 1945, and October 11, 1946, the $9,749,000 involved herein was paid in settlement of unliquidated claims for past patent infringements and was deposited in the registry of the court. The government's counsel conceded at the hearing below that the respective sums paid by nine of the defendant manufacturers were paid in settlement of their infringements of the patents. Each settlement agreement between the patent owner and the infringing manufacturer included a license for operation under the patents in the future. The record discloses that no part of the sums so paid constituted royalty payments. This appears, not only from the documentary evidence, but also from the affidavit of counsel for Cold Metal Process Company who was active in the negotiation of the settlement agreements with the nine infringers, and the fact is uncontradicted in the record. Counsel for the government conceded at the trial that

the contention was not being made that "the term 'royalty' as it's commonly understood normally applies to settlements of infringement cases."

After denying certiorari on May 3, 1948, the Supreme Court, by denial on June 1, 1948, of a rehearing brought to an unsuccessful end the effort of the United States to cancel the Steckel patents. United States v. Cold Metal Process Co., 334 U.S. 811, 68 S.Ct. 1016; Id., 334 U.S. 835, 68 S.Ct. 1343.

On June 15, 1948, the district court directed its clerk to pay over, not earlier than June 25, 1948, to the trustee for the patent owner the impounded $9,749,000. On June 23, 1948, the complaint in the instant action was filed. A temporary restraining order was entered to allow time for the taking of evidence and the hearing of the case. After the hearing, as stated at the outset, the district court refused to grant a preliminary injunction impounding the funds paid into its registry in the manner heretofore described; and ordered its clerk to pay over the impounded funds to the trustee of the patent owner. Application of the United States for a stay of execution pending appeal was denied, but the appellant was allowed a ten-day stay to permit the United States to apply to this court for like relief. Upon presentation of the application to Judge Allen, a member of this court, the petition for stay pending appeal was denied upon condition that the clerk of the district court should disburse the impounded money to the trustee, who would be required to invest it in the Federal Reserve Bank at Cleveland, Ohio, to be held there pending disposition of this appeal and the further order of this court.

■ In denying the motion for preliminary injunction, the district court, finding that the impounded moneys were paid in settlement of infringement claims, held that the Royalty Adjustment Act is limited in its application to *royalty payments* by licensees to licensors. This interpretation·is in direct conformity with the language of the act. Nowhere therein can be found any expression by Congress indicating that the scope of the act extended to the settlement of patent infringement claims.

·The Royalty Adjustment Act, approved October 31, 1942, 56 Stat. 1013, et seq., 35 U.S.C.A. §§ 89–96, is entitled, "An Act to provide for adjusting royalties for the use of inventions for the benefit of the United States, in aid of the prosecution of the war, and for other purposes." The first sentence of the enacting clause provides that whenever an invention, whether patented or unpatented, shall be manufactured, used, sold or otherwise disposed of for the United States, *with license from the owner thereof* or any one having the right to grant licenses thereunder, and such license includes provision for the *payment of royalties* the rates or amounts of which are believed to be unreasonable or excessive by the head of the department or agency of the government which has ordered such manufacture, use, sale, or other disposition, such department or agency head shall give written notice of such fact to the licensor and to the licensee.

The act then sets up the procedure and machinery for determination by the head of the government department or agency concerned of the rates and amounts of royalties found to be fair and just, taking into account the conditions of wartime production. Notice, as specified, is required to be given to the licensor and to the licensee, with reasonable opportunity permitted them to present any fact or circumstance considered to have bearing upon the rates or amounts of royalties. After the effective date of notice, the licensee is forbidden to pay to the licensor, or to charge directly or indirectly to the United States, a royalty, if any, in excess of that specified in the order on account of the manufacture, use, sale, or other disposition of the invention. The head of the department or agency of the government concerned shall authorize the payment of allowed royalties by the licensee to the licensor.

By the second section of the act, any licensor aggrieved by an order issued pursuant to the first section thereof, which has just been analyzed, may institute suit against the United States in the Court of Claims, or in the district courts of the United States in so far as vested with concurrent jurisdiction, to recover any additional royalties which will constitute fair

and just compensation for the manufacture, use, sale, or other disposition of the licensed invention. In any such suit, the United States is privileged to avail itself of any and all defenses which might be pleaded by the defendant in an action for patent infringement.

The third section of the act authorizes department and agency heads to settle and compromise claims against the United States accruing to the patent owner or licensor under the provisions of the act; and the fourth section provides that, whenever a reduction "in the rates or amounts of royalties" is effected by order pursuant to the first section or by compromise or settlement pursuant to the third section of the act, "such reduction shall inure to the benefit of the Government by way of a corresponding reduction in the contract price to be paid directly or indirectly for such manufacture, use, sale, or other disposition of such invention, or by way of refund if already paid to the licensee."

The ensuing section authorizes the delegation of conferred power and authority by department or agency heads to qualified and responsible officers, boards, agents, or persons designated or appointed. Then follows a section which provides that, for the purposes of the act, the manufacture, use, sale, or other disposition of an invention, "by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government" shall be construed as use or manufacture for the United States.

The seventh section of the act provides that it shall apply "to all royalties directly or indirectly charged or chargeable to the United States" for any supplies, equipment, or material to be delivered to or for the government from and after the effective date of the notice provided for in the first section. The termination date of the first two sections is fixed at six months after the termination of the war, except that accrued rights and liabilities are to remain enforceable. The last section of the act authorizes department and agency heads to issue rules and regulations, and to obtain necessary information; makes the provisions of certain code sections applicable; and defines "defense contract" as used in section 643–643c of Appendix to Title 50 U.S.C.A., to mean and include an agreement for the payment of royalty, regardless of the date of such agreement under or by virtue of which royalty is directly or indirectly paid by the government or included within the contract price for property sold or manufactured for the government.

From the foregoing analysis, it is obvious that the Royalty Adjustment Act in express terms relates to royalties, and does not embrace within its scope, by expression or by logical inference, amounts paid in settlement of unliquidated damage claims for patent infringement.

The government contends, however, that, while the act on its face is directly addressed to control of royalties in the conventional sense, it should not be literally so construed and limited; that the act had "a broader and more general intent, namely, to prevent the taxation upon the United States, in whatever form and under whatever circumstance, of monies attributable to patent structure arising out of contractual relation between the patent owner and another"; and that it has been understood by those charged with its administration to apply more broadly to circumstances involving other than a precise licensor-licensee relationship.

The government asserts that its position is buttressed by legislative history, in that Congress early recognized that the United States must be freely able to procure patented articles and to use patented processes directly or by its contractors, without interference by patent owners, subject only to their rights to secure reasonable and entire compensation for the use of the patents by direct action against the United States, U.S.C.A., Title 35, § 68, Act of June 25, 1910, as amended July 1, 1918, 40 Stat. 705 [now 28 U.S.C.A. § 1498]; and that the object of Congress, evinced in the Royalty Adjustment Act, was to close the breach existing in the control of profiteering upon patent structure resulting from the inherent limitations of the earlier act of 1910 and its amendment of 1918.

The Act of 1910, supra, was enacted for the purpose expressed in its title of pro-

viding "additional protection" to owners of patents of the United States, and for other purposes. Patent owners were granted permission to sue the United States in the Court of Claims for the recovery of reasonable compensation for unlicensed use by the United States of a patented invention. But no protection against infringement suits was afforded those who supplied the government, inasmuch as they remained liable in an infringement suit brought by a patent owner, although the patented article had been manufactured for the United States. See Cramp & Sons Ship & Engine Building Co. v. International Curtis Marine Turbine Co., 246 U.S. 28, 38 S.Ct. 271, 62 L.Ed. 560.

By the 1918 amendatory Act, supra, the patent owner's remedy in the Court of Claims was extended to the recovery of his reasonable and entire compensation for the use and manufacture by or for the United States of unlicensed inventions. This covered *infringing manufacturers*. After the amendatory act became effective, however, *a manufacturer licensed to use a patent* remained liable for the payment of royalty rates fixed in the license agreement, even though the product was manufactured for the United States. See Newport News Shipbuilding & Dry Dock Co. v. Isherwood, 4 Cir., 5 F.2d 924, 933, 934; petition for certiorari dismissed on motion 269 U.S. 552, 592, 593, 46 S.Ct. 13, 70 L.Ed. 429.

It is considered unnecessary to indulge in an extended discussion of the legislative history of the Royalty Adjustment Act. From our study, we find no justification for the argument that the 1942 act was intended to extend beyond its express provisions in limiting its coverage to the adjustment of royalties under patent licenses. In his communication to the Speaker of the House of Representatives, the Secretary of War, in relating the purposes of the proposed legislation, repeatedly used such expressions as "royalties under patent licenses," "under licensing agreements entered into during peacetime," and "manufacturers or users operating under license agreements." One of the purposes which he stated was "to prescribe the legal remedy of patent licensors with respect to disputed royalties." [Hearings before the Committee on Patents, 77 Cong. 2nd Session, on H. R. No. 7620, p. 3.]

It is evident that the Secretary of War considered that the proposed act of 1942 was needed, for the reason that the manufacture of inventions under license agreements was not covered by the 1910 act, as amended in 1918, thus necessitating provisions which would prevent the United States from being loaded with excessive royalties payable under license agreements.

The reports of the Senate and House committees accompanying the proposed bill gave substantially the same reasons for its enactment as were offered by the Secretary of War. [Senate Committee on Patents, Report No. 1640, pp. 1 and 2; House Committee on Patents, Report No. 2602, pp. 3 and 4.] The first purpose stated in the Report of the House Committee on Patents was "to eliminate the payment of excessive royalties by the Government to the owners of inventions on articles manufactured under licenses to Government contractors or sub-contractors." The statement of both committees made clear that the act proposed to treat with the "licensed use" of inventions, either patented or unpatented, so as to "determine the reasonableness of any royalties paid in connection with procurement during the war or the use of patented or unpatented inventions by producers of such articles for the Government."

The government stresses the broad language of the third stated purpose in the Report of the House Committee: "To place the owners of inventions utilized by the Government in the war effort on an equal footing and to permit the Government to exercise its rights to utilize such inventions through the medium of any desired source of supply, without having to pay more than a fair and just compensation to the owners of such inventions."

The report must be construed in its context. So considered, the House Committee evidently proposed to right an unequal situation in that manufacturing for government use by patent infringement was covered by existing law, but manufacturing for government use on a license basis was not.

This is substantiated by the Senate Report, wherein it was stated: "In recent months it has become apparent that procurement costs of material in certain instances include exorbitant royalties under already existing patent licenses. The principal motive of the bill is to remedy such situations. Our courts have held that the act of 1910, as amended, does not apply where an invention is furnished for use of the United States by the licensee under a patent and is no defense to a suit by the owner of the patent against the licensee for royalties. Newport News Shipbuilding and Dry Dock Co. v. Isherwood et al. [5 F.2d 924], certiorari denied (269 U.S. 592 [46 S.Ct. 13, 70 L.Ed. 429])."

From the Report of the House Committee on Patents it is clear that the purpose of the proposers of the Royalty Adjustment Act was to prevent the collection of royalties by a licensor from his licensee under a royalty contract in amounts greater than those determined to be fair and just by the government agency concerned. Very recently, the Court of Appeals for the Third Circuit stated that the Royalty Adjustment Act "extends to inventions manufactured under license what its precursor, the Act of 1910, provided with respect to unlicensed inventions"; and that "its new feature permits the Government to use the licensee as its manufacturing agent, instead of itself appropriating the patent and using a stranger to the patentee as manufacturer, as the 1910 Act would permit." Coffman v. Federal Laboratories, Inc., et al. (United States, Intervenor), 3 Cir., 171 F.2d 94.

We find nothing in the committee reports, or in the legislative history of the act, to justify the argument of appellant that there was any intention to apply the Royalty Adjustment Act to operations conducted without license in infringement of patents, or to payments in settlement of claims for patent infringements.

The complaint in this cause, filed on June 23, 1948, sought enforcement of a royalty adjustment order promulgated June 11, 1948, by an administrative board vested with appropriate authority by the heads of the War, Navy and Treasury Departments, the Maritime Commission, and the Reconstruction Finance Corporation. The order was issued following appropriate notices to the interested parties challenging the reasonableness of "royalties, both retroactive and prospective, and all other moneys charged or chargeable directly or indirectly" to the United States on account of the manufacture and use of the metal rolling inventions, by virtue of license agreements between the licensors, Cold Metal Process Company and the Union National Bank of Youngstown, Ohio, Trustee, and eleven named corporate licensees. The order, however, was confined in express terms to the fixing of "fair and just rates or amounts of royalties, if any, to be paid to the licensors by their licensees." Such royalties were fixed at "zero." The order, in terms, applied to "all royalties charged or chargeable directly or indirectly to the Government of the United States," and embraced those on metal delivered to the government after the effective dates of the notices and to royalties on metal already delivered to the government which had not been paid to the licensors prior to the effective date of the notices. The order was not as broad in coverage as was the notice. The order, and not the notice, of course, records the action of the administrative board. Its recorded action related to "royalties" only, and did not embrace by words or by reasonable inference amounts paid in settlement of infringement claims.

Appellant contends that the district court erred in overlooking an earlier royalty adjustment order of December 29, 1944, which provided, with respect to any mill licensed for the first time after the date of the order or "previously licensed and structurally varied" after the order, that the rate and amount of royalty should be "zero," unless and until the order was amended to provide a different rate or amount of royalty. It is declared that this earlier order, which was issued to the licensors and to seven of the eleven infringers involved in this action, prohibited any transactions which would result in the imposition on the United States of charges arising from the Cold Metal patent structure. The earlier

order, like the order involved herein, restricts royalties from any mill licensed for the first time after the date of the order. Moreover, like the instant order, the earlier one fails in terms to deal with or mention payments in settlement of infringement claims for unlicensed operations. The earlier royalty adjustment order would seem to have no determinative bearings here.

■ Appellant urges in effect that administrative practice supports its position that the Royalty Adjustment Act should be expanded to a coverage beyond its express terms. The affidavit of a Navy Captain, a lawyer charged with the administration of the act, was offered by appellant and received in evidence wherein it was asserted that the uniform practice of the Navy and other departments of the military establishment of the United States has been to apply and administer the act "against royalties taking the form of settlements of infringement suits when it appeared that such settlements were either charged against procurement of the United States or were charged or chargeable to the United States in any other manner."

The affidavit of the administrative Navy Captain, while broad in generalization, makes no reference to any instance where the Royalty Adjustment Act has been applied to settlements for past infringements covering unlicensed operations. The application of the act to situations where royalties assume the guise of settlements, which the affiant evidently had in mind, would not be analogous in the circumstances of this case. Moreover, the affidavit is apparently self-serving and construes the authority of the government's administrative representatives more broadly than can be spelled out from the wording of the act.

■ The showing of administrative practice is inadequate to sustain the insistence of appellant. But, even if it did, administrative practice is of no avail "to overcome a statute so plain in its commands as to leave nothing for construction." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796. Undoubtedly, interpretations by governmental agencies charged with responsibility for making the machin-ery of an act of Congress work efficiently and smoothly are entitled to great weight. United States et al. v. American Trucking Associations, Inc., et al., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345. But, as Chief Justice Hughes succinctly said, in Louisville & Nashville Railroad Company v. United States, 282 U.S. 740, 759, 51 S.Ct. 297, 304, 75 L.Ed. 672: "Long-continued practice and the approval of administrative authorities may be persuasive in the interpretation of doubtful provisions of a statute, but cannot alter provisions that are clear and explicit when related to the facts disclosed." See Standard Oil Co. v. Fitzgerald, 6 Cir., 86 F.2d 799, 802.

Appellant has cited no judicial decision supporting its construction of the Royalty Adjustment Act. On the contrary, the district judge cites in his memorandum opinion four cases which are in accord with his interpretation. In Timken-Detroit Axle Co. v. Alma Motor Co. (United States, Intervener), 3 Cir., 144 F.2d 714, 717, 718, the court of appeals upheld the constitutionality of the Royalty Adjustment Act, and construed the act as filling the gap left by the act of 1910, as amended, in that "it permits a governmental agency to adjust royalty payments to a patentee if the payments provided for in the royalty agreement are thought to be too high." Upon the principle that the constitutionality of an act of Congress should not be adjudicated unless necessary to decision of a justiciable controversy, the Supreme Court remanded the case for determination of the issue as to whether the subject matter of the litigation was covered by the patent and the license agreement involved. Chief Justice Vinson said: "The Act provides that it is only 'whenever an invention * * * shall be manufactured * * * for the United States, *with license from the owner thereof* * * *.' and the department head believes the stipulated royalties to be unreasonable, that the latter shall give 'written notice of such fact to the licensor and to the licensee.' It is only after such notice that the department head may fix 'fair and just' royalties, and only 'such licensee' who is forbidden to pay additional amounts as royalties, and only 'such licensor' who is relegated to the

Court of Claims. Conversely, if the putative invention is manufactured without license, or if the putative patentee is not actually the owner, these powers and disabilities do not arise." Alma Motor Co. v. Timken-Detroit Axle Co. et al., 329 U. S. 129, 137, 138, 67 S.Ct. 231, 234, 91 L.Ed. 128. It would seem from this decision of the Supreme Court that the Royalty Adjustment Act is not considered by the highest authority to be applicable where the invention is manufactured without license.

Appellees comment that the interpretation of the Royalty Adjustment Act upon which the United States insists in the case at bar is inconsistent with the government's construction, arguendo, in two cases decided by the United States Court of Claims, both of which were cited by the district judge. Yassin v. United States, 110 Ct.Cl. 211, 76 F.Supp. 509; and Fulmer v. United States, Ct.Cl., 77 F.Supp. 927. Consideration of excerpts from the government's briefs in those cases indicates that the government has shifted its position. However that may be, the two opinions of the Court of Claims lend weight to the district court's interpretation of the Royalty Adjustment Act.

■ In the Yassin case, supra, the petitioner sought to recover reasonable compensation for the manufacture and use, by and for the United States, of certain devices claimed to infringe patents of the plaintiff. A demurrer of the United States to the amended petition was sustained. Two significant and, we think, correct statements were made in the opinion of the Court of Claims: "The main purpose of the Royalty Adjustment Act was to provide for the adjustment of patent royalties provided for under existing license agreements for the use of inventions, whether patented or unpatented, for the benefit of the United States, in aid of the prosecution of the war. * * * Plaintiff had no license agreement with anyone providing for payment of a royalty under his U. S. patent and, therefore, none of the provisions of the act relating to that matter has any application to his claim." 110 Ct.Cl. 211, 76 F.Supp. 518, 519.

In the Fulmer case, supra, the claimed inventor of an unpatented invention for camouflaging colored parachutes filed an amended petition to recover compensation for the use of his invention by the government. He alleged that he had disclosed his invention to officers of the United States, in consideration of their promise that the disclosure would be treated in confidence and that, if the invention were used by the government, he would be reasonably compensated. The petition was dismissed. It was held that the plaintiff had no cause of action under the Royalty Adjustment Act of October 31, 1942, 35 U.S.C.A. §§ 89–96. The Court of Claims said: "Plaintiff had no license agreement with anyone for the payment of a royalty for the use of his alleged invention in connection with the manufacture of articles for the United States, and there could not, therefore, be an order by the head of a department or agency upon which that act conditions the right to sue. An allegation that defendant used plaintiff's unpatented device is not, therefore sufficient to bring plaintiff's case within the terms of that Act." 77 F.Supp. 927, 928.

■ A well recognized distinction exists between the payment of royalty and the payment of money in settlement of claims for infringement. The distinction was well drawn by Chief Justice Rugg of the Supreme Court of Massachusetts in Raytheon Manufacturing Company v. Radio Corporation of America, 286 Mass. 84, 190 N.E. 1, 5: "The word 'royalty' commonly imports payment for permissive or lawful use of a property right, and not damages for a pirated or illegal appropriation of such property right. * * * A release for wrongs done in the past is not the equivalent of a license to do rightfully the same thing in the future."

■ Construing the Royalty Adjustment Act as written, we perceive in its provisions no applicability to the impounded funds involved herein, all of which were proceeds from the settlement of patent infringement claims. It is not the appropriate function of the federal courts to rewrite an act of Congress so as to supply by strained construction omissions which, if written into the act, would, in the juristic view, be more protective of the public interest. The Constitution has entrusted

112

to the Congress, and not to the courts, the policy of our national laws.

The order of the district court from which this appeal was taken is affirmed.