## TIMKEN–DETROIT AXLE CO. v. ALMA MOTOR CO. (UNITED STATES, Intervener).

### No. 8300.

Circuit Court of Appeals, Third Circuit.

Argued April 18, 1944.

Decided Aug. 7, 1944.

As Amended on Denial of Rehearing Oct. 2, 1944.

715

I. Joseph Farley, of Detroit, Mich., and Alexander L. Nichols, of Wilmington, Del. (Thomas J. Hughes, of Detroit, Mich., and Hugh M. Morris, of Wilmington, Del., on the brief), for appellant.

William A. Strauch, of Washington, D. C. (J. Matthews Neale and Strauch & Hoffman, all of Washington, D. C., and Clarence A. Southerland and Southerland, Berl & Potter, all of Wilmington, Del., on the brief), for plaintiff-appellee.

Francis M. Shea, of Washington, D. C. (Gerald Gleeson, U. S. Atty., of Philadelphia, Pa., Lester P. Schoene and David L. Kreeger, Sp. Assts. to Atty. Gen., and Jerome H. Simonds, Atty., Dept. of Justice, of Washington, D. C., on the brief), for intervenor.

Before MARIS, GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This action was brought under the Declaratory Judgment Act[1] by the Timken-Detroit Axle Company (herein called "Timken") against Alma Motor Company (herein called "Alma"). The plaintiff in the action sought a declaration that certain patents owned by Alma covering a mechanism known as a "transfer case" which Alma had licensed Timken to use for a stipulated royalty were invalid and further that transfer cases manufactured by it did not come within the scope of the license agreement so as to require payment of royalties. Alma counterclaimed for damages on account of alleged unpaid royalties. On September 23, 1942, the District Court held that Timken, as licensee, was estopped to contest validity and, second, that certain of the transfer cases manufactured by Timken were within and certain others were without the license. Alma appealed to this Court on February 27, 1943.

On July 28, 1943 the United States War Department issued Royalty Adjustment Order No. W-3 pursuant to the Royalty Adjustment Act of October 31, 1942.[2] That order directed Timken to pay no more royalties whatever to Alma under the license agreement for transfer cases manufactured for the United States. Alleging that the "structures here in suit have all been made for the Government," Timken then moved to dismiss the appeal on the grounds that there was no longer a justiciable controversy under the Declaratory Judgment Act. Alma, in response to directions from this Court, asserted its position with regard to constitutionality of the Royalty Adjustment Act by questioning its validity. The Clerk of this Court certified to the Attorney General that the constitutionality of the Act had been questioned and the United States, in response to this certification, filed a petition of intervention on December 30, 1943, pursuant to the Act of August 24, 1937.[3]

Since the transfer cases manufactured by Timken on which royalty payments are claimed were all made in fulfilment of a contract with the United States and since the War Department's order forbade Timken to pay any royalties thereon, it follows that if the statute applies and the order was made pursuant to it, the order in this appeal should be so framed as not to pass upon what has, by events since the original trial, become moot. Before consideration of the statute on which the litigation turns, however, it will be well to see just what ground was covered by earlier legislation, the constitutionality of which has been settled by authoritative court decisions, and thus more clearly appreciate the scope of the questions involved in the presently considered legislation.

Congress by statute provided in the Act of 1910,[4] as amended by the Act of 1918,[5] that when a patented invention is used or manufactured by or for the United States without license from the owner, the latter's remedy for recovery of his compensation should be by suit against the United States in the Court of Claims. Thus, patents could be infringed in the course of governmental production or procurement free from threat of injunction against the manufacturer for use of the invention, leaving the amount to be paid to the patentee to be adjusted by suit in the Court of Claims. The constitutionality of this legislation has been upheld. Crozier v. Fried. Krupp Aktiengesellschaft, 1912, 224 U.S. 290, 307, 32 S.Ct. 488, 56 L.Ed. 771; Richmond Screw Anchor Co. v. United States, 1928, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303.

This legislation and the decisions upholding it go very far in taking away any element of startling novelty which might impress one first confronted with the 1942 statute. The monopoly given to a patentee, itself a right created by federal legislation, may be in effect requisitioned by the United States, in carrying out its constitutional powers, leaving the patentee to recover through litigation the value of the partial appropriation of his patent right. The upholding of this statute demonstrates the constitutionality of the exercise of eminent domain in the patent field and,

---

[1] Act June 14, 1934, 48 Stat. 955, Act Aug. 30, 1935, 49 Stat. 1027, 28 U.S.C.A. § 400.

[2] 56 Stat. 1013, 35 U.S.C.A. §§ 89–96.

[3] 50 Stat. 751, 28 U.S.C.A. § 401.

[4] 36 Stat. 851, 35 U.S.C.A. § 68.

[5] 40 Stat. 705, 35 U.S.C.A. § 68.

likewise, the sufficiency of the provision for recovery of compensation by a suit in the Court of Claims.

The 1910 statute, as amended, did not cover quite the entire field. If the patentee had licensed the contractor to use the invention the statute was not available. Newport News Shipbuilding & Dry Dock Co. v. Isherwood, 4 Cir., 1925, 5 F.2d 924, certiorari denied, 1925, 269 U.S. 552, 592, 46 S.Ct. 13, 70 L.Ed. 429. In such a case there was no threat of injunction for infringement of the patent which could stop the supplying of goods for the use of the United States. But the testimony presented at the Congressional hearings prior to the passage of the 1942 Act showed a difficulty which, while less acute than the possibility of injunction, was nevertheless thought to be important.[6] It was developed that contractors supplying materials to the Government were under license contracts with patent owners entered into with peacetime scales of production in mind. License rates which were fair enough on a peacetime production scale became unduly high when the demand was increased many fold by the Governmental requirements for global war. The result was high cost of the articles to the public and what was considered to be an unduly rich reward to the owner of a particular patent whose licensee was producing war goods for the United States. Congress, with these considerations in mind, passed the Act of October 31, 1942, the constitutionality of which is questioned here. The statute, the pertinent part of which is quoted in the margin,[7] fills the gap left by the Act of 1910, as amended. It permits a Governmental agency to adjust

---

[6] Hearings, House Committee on Patents, on H. R. 7620 (77th Cong., 2d Sess., October 13–15, 1942) pp. 3, 9, 17–19, 21, 32, 42–44.

[7] Sections 1 and 2 read as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, to aid in the successful prosecution of the War, whenever an invention, whether patented or unpatented, shall be manufactured, used, sold, or otherwise disposed of for the United States, with license from the owner thereof or anyone having the right to grant licenses thereunder, and such license includes provisions for the payment of royalties the rates or amounts of which are believed to be unreasonable or excessive by the head of the department or agency of the Government which has ordered such manufacture, use, sale, or other disposition, the head of the department or agency of the Government concerned shall give written notice of such fact to the licensor and to the licensee. Within a reasonable time after the effective date of said notice, in no event less than ten days, the head of the department or agency of the Government concerned, shall by order fix and specify such rates or amounts of royalties, if any, as he shall determine are fair and just, taking into account the conditions of wartime production, and shall authorize the payment thereof by the licensee to the licensor on account of such manufacture, use, sale, or other disposition: *Provided, however,* That the licensee or licensor, if he so requests within ten days from and after the effective date of said notice, may within thirty days from the date of such request present in writing or in person any facts or circumstances which may, in his opinion, have a bearing upon the rates or amounts of royalties, if any, to be determined, fixed and specified as aforesaid, and any order fixing and specifying the rates and amounts of royalties shall be issued within a reasonable time after such presentation. Such licensee shall not after the effective date of said notice pay to the licensor, nor charge directly or indirectly to the United States a royalty, if any, in excess of that specified in said order on account of such manufacture, use, sale, or other disposition. The licensor shall not have any remedy by way of suit, set-off, or other legal action against the licensee for the payment of any additional royalty remaining unpaid, or damages for breach of contract or otherwise, but such licensor's sole and exclusive remedy, except as to the recovery of royalties fixed in said order, shall be as provided in section 2 hereof. Written notice as provided herein shall be mailed to the last known address of the licensor and licensee and shall be effective upon receipt or five days after the mailing thereof, whichever date is the earlier.

"Sec. 2. Any licensor aggrieved by any order issued pursuant to section 1 hereof, fixing and specifying the maximum rates or amounts of royalties under a license issued by him, may institute suit against the United States in the Court of Claims, or in the District Courts of the United States insofar as such courts may have concurrent jurisdiction with the Court of Claims, to recover such sum, if any, as, when added to the royalties fixed and specified in such order, shall constitute fair and just compensation to the licensor for the manufacture, use, sale, or other disposition of the licensed invention for the United States, taking into account the conditions of wartime production. In any such

royalty payments to a patentee if the payments provided for in the royalty agreement are thought to be too high. The patent owner is given the opportunity to be heard concerning the matter before the Governmental agency and if the price to be paid is not fixed to his satisfaction as a result of such a hearing he has the right to sue the Government for his compensation.

■ What we have here is a taking of private property for public use. The property involved is the patent owner's royalty rights under the license with the manufacturer. No one doubts, of course, the power of the Government to take private property for public use if the constitutional requirements for compensation are met. The necessity for the taking in a particular instance is for the legislative body, not the courts, assuming that the purpose is one for which the power might be exercised. North Laramie Land Co. v. Hoffman, 1925, 268 U.S. 276, 45 S.Ct. 491, 69 L.Ed. 953; Joslin Co. v. Providence, 1923, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167; Bragg v. Weaver, 1919, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135.

Was the taking provided for in the 1942 statute one for a public use? It certainly was if it was in pursuance of the war power of the United States, expressly delegated to the national Government by the Constitution. Furthermore, we have authority which supports appropriations in the patent field in the decisions, already cited, applying the 1910 Act. Our only new question here, therefore, is the public use aspect of the extension by legislation to include the taking over of license agreements as well as patent rights not subject to such agreements. It hardly requires discussion to demonstrate that the scope of Governmental activity involved in the prosecution of a war upon the scale which armed conflict involves today reaches far beyond that pertaining directly to the clash of arms. It justifies legislation providing for price control of commodities, Yakus v United States, 1944, 321 U.S. 414, 64 S.Ct. 660, the fixing of rents, Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641, the furnishing of housing for workers in communities where war goods are made and the determination of what the houses shall be, United States v. City of Chester, 3 Cir.,

1944, 144 F.2d 415. Total war, today, is not a figure of speech but a grim fact.

■ The readjustment of royalties to be paid to a patent owner by his licensee upon articles supplied to the United States in wartime is also within the scope of the conduct of total war. The demands of the war effort have made first call upon the industrial power of the nation to an extent hitherto unknown. Goods in gigantic quantities are produced as a result of this mobilization. They must be paid for by the taxpayers of the United States. A legislative provision, the purpose of which is to secure the necessary materials at reasonable prices, is not less a part of the general war effort than the procurement of goods of war themselves. The subject matter of the Royalty Adjustment Act is clearly within the war power of Congress.

■ We think the statute may constitutionally be applied to royalties which had accumulated between the passing of the statute and the giving of the notice to the patentee by the War Department and also to those which had accumulated prior to the statute. It is especially provided by the Act that the public is to get the benefit of any readjustment in royalties made by a reduction in the price paid for goods purchased from the licensee. The wartime conditions which prompted the passing of the statute existed prior to the date of its enactment and the statute seeks to cover them. It is true that in so doing the public right is asserted against the individual patent owner who has made an advantageous contract for the use of his patent. If the public right is constitutionally asserted within any particular field it prevails over private contracts even in cases of exercise of police or other regulatory power where the person affected is not given compensation. Thus a man who has secured a contract for a free pass cannot claim it against Congressional legislation invalidating his agreement. Louisville & Nashville R. R. v. Mottley, 1911, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A.,N.S., 671. Nor can a shipper who has secured a favorable rate by contract have the advantage of that agreement when legislation provides a different rate. New York v. United States, 1922, 257 U.S. 591, 600, 601, 42 S.Ct. 239, 66 L.Ed. 385. Nor can one with a profita-

suit the United States may avail itself of any and all defenses, general or special, that might be pleaded by a defendant in an

action for infringement as set forth in title sixty of the Revised Statutes, as otherwise."

ble contract for the sale of intoxicating liquor enforce it after the sale of the subject-matter has been forbidden. Boer v. Garcia, 1925, 240 N.Y. 9, 147 N.E. 231. Nor can a contractual provision for limited benefits to employees preclude the right to recovery under a subsequent enactment of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Philadelphia B. & W. R. Co. v. Schubert, 1912, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911. So, here, the exercise of the public use in the pursuance of the wide-sweeping and important war power cuts across private interests. The patent owner's right is, for war purposes at least, subject to be appropriated in the public interest and his individual contract claims are subordinate thereto. If individual contract rights may be interfered with in pursuance of regulatory power exercised on behalf of the general public it is even clearer that such rights are subordinate to the public interest when compensation is given the individual for such interference.

■ We pass then to the question of compensation. Alma complains that the hearing before officials of the War Department was, as to it, a deprivation of constitutional rights. The hearing, or conference, is provided for in the sections of the Act quoted above. Alma was notified of a proposed action under the statute with regard to its license agreement with Timken. It appeared by its president, accompanied by counsel, and was heard. Alma complains that the scope of the notice given it and the order, following the hearing, reducing its fees under the license agreement to nothing did not correspond; that is, that the order was not responsive to the notice. We think that the complaint in this respect misconceives both the nature of the hearing and the order which resulted therefrom. The hearing provided for is not in the nature of a complaint before a regulatory agency, but, instead, gives an opportunity for possible amicable adjustment between the Government agency and the patent owner. But the result does not bind the patent owner. By the express terms of the statute he is entitled to sue for what he believes himself to be entitled and the conclusions of the administrative officer are in no way binding upon him or the court.[8] Provision for such a hearing is not constitutionally required; the 1910 Act, as amended did not include it. The insertion into the law of a provision for a conference which conceivably could result in mutual satisfaction to Government and patent owner can hardly be unconstitutional when no such conference is necessary as a matter of constitutional right and when its results are not binding upon the patent owner if he later seeks compensation through court action.

■ The provision for recovery of compensation against the United States through suit in the Court of Claims is sufficient compliance with the constitutional provision for just compensation. Crozier v. Fried Krupp Aktiengesellschaft, 1911, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771; Identification Devices v. United States, 1941, 74 App.D.C. 263, 121 F.2d 895, certiorari denied 1941, 314 U.S. 615, 62 S.Ct. 63, 86 L.Ed. 495, 1942, 314 U.S. 587, 62 S.Ct. 477, 86 L.Ed. 474, rehearing denied 1941, 314 U.S. 710, 714, 62 S.Ct. 174, 357, 86 L.Ed. 566, 569, 1942, 315 U.S. 779, 62 S.Ct. 485, 86 L.Ed. 1187; Pierce v. Submarine Signal Co., D.C.Mass., 1939, 25 F.Supp. 862. This in itself would be enough to uphold the constitutionality of a statute upon this point. The constitutionality is not impaired by a provision for a conference or hearing prior to court action which, if satisfactory, amicably adjusts that which otherwise would take litigation to settle. Our conclusion is that the statute is a constitutional exercise of the power of eminent domain by Congress in aid of its expressly granted war power. It simply goes the one step further to cover the exercise of that power in the field of patents, which had already been made by the Act of 1910, as amended. The provision of the law for compensation to the owner is within the constitutional requirement of due process of law. Alma, denied payment under the royalty agreement, is entitled to sue for whatever royalties it believes itself to be entitled and no administrative determination that it is not entitled to them will interfere in its suit. In upholding the constitutionality of the statute we do not, of course, make any determination with regard to the validity or lack of validity of the patents involved in the original litigation.

■ Nor do we by this decision upholding the Royalty Adjustment Act of 1942 deprive Alma of the benefit of any estoppel

---

[8] The petition of December 7, 1943 by Alma to Review and Vacate Royalty Adjustment Order No. W-3 will be dismissed for want of jurisdiction.

secured by the judgment. We therefore direct the following disposition of the case. Paragraph 5 of the judgment entered by the District Court in this cause is vacated and the cause is remanded to the District Court with directions to proceed no further therein unless and until it shall appear to the Court that a justiciable controversy exists between the parties arising out of the facts set forth in the complaint, except that the Court may, if it deems such action to be appropriate, vacate all or any part of the remainder of the judgment and dismiss the complaint as moot.