**COFFMAN v. FEDERAL LABORATORIES, Inc., et al. (UNITED STATES, Intervenor).**

No. 9545.

United States Court of Appeals Third Circuit.

Argued April 23, 1948.

Decided Nov. 9, 1948.

Writ of Certiorari Denied Feb. 14, 1949.

See 69 S.Ct. 603.

Coombs, Jr., of Jersey City, N. J., and John G. Buchanan, Jr., of Pittsburgh, Pa., on the brief), for appellant.

Thomas McNulty, of Jersey City, N. J. (Seif, Evashwick & Best, of Pittsburgh, Pa., and Milton, McNulty & Augelli, of Jersey City, N. J., on the brief), for appellee.

. Melvin Richter, of Washington, D. C. (H. G. Morison, Asst. Atty. Gen., Owen M. Burns, U. S. Atty., of Pittsburgh, Pa., and Roy C. Hackley, Jr., and Paul A. Sweeney, Attorneys, Department of Justice, both of Washington, D. C., on the brief), for intervenor.

Before GOODRICH and KALODNER, Circuit Judges and FEE, District Judge.

GOODRICH, Circuit Judge.

The instant case presents to this Court, for the second time, the constitutionality of the wartime Royalty Adjustment Act.[1] The question first came to us in Timken-Detroit Axle Company v. Alma Motor Company [2] and we upheld the validity of the legislation. Our judgment was vacated by the Supreme Court and the case remanded to us with directions to determine first the non-constitutional issues of the litigation between the parties.[3] This we did and the decision was rendered on patent law points involving no constitutional questions. 3 Cir., 1947, 163 F.2d 190.

This case cannot thus be disposed of. The plaintiff, Coffman, sues for royalties alleged due him under a licensing agreement made with the defendant in 1932.[4] The defendant defends under the terms of the Royalty Adjustment Act and, more specifically, Royalty Adjustment orders W-9 and N-7 issued respectively by the War Department and Navy Department pursuant to the statute.[5]

James D. Carpenter, Jr., of Jersey City, N. J., and John G. Buchanan, of Pittsburgh, Pa. (Smith, Buchanan & Ingersoll, of Pittsburgh, Pa., Carpenter, Gilmour & Dwyer, of Jersey City, N. J., William H. Eckert, of Pittsburgh, Pa., Samuel M.

---

[1] 56 Stat. 1013 (1942), 35 U.S.C.A. §§ 89–96.

[2] 3 Cir., 1944, 144 F.2d 714.

[3] 1946, 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128.

[4] Coffman filed two complaints. In the first one, filed on June 14, 1944, royalties were claimed for each year from 1937 through December 31, 1943. The second action filed on August 24, 1945 claimed royalties at the rate specified in the contract for the period which ran from January 1, 1944 to December 31, 1944. By an order of the District Court these cases were consolidated for trial.

[5] These orders directed Federal Laboratories to pay no more royalties whatever under the license agreement on cartridges manufactured for the United States and limited such payments on starters manufactured for the Government to $8.00 per starter with an overall limitation of payments in any one year to $50,000.

The defendant disputed part of the amount due on other grounds not involving the statute or the validity of the plaintiff's patents. But these defenses went to a portion of the claim only; as to the remainder the sole defense is the Royalty Adjustment Act. If it and the orders made pursuant to it are valid, the defendant is not liable to the plaintiff and the District Court so held. D.C.W.D.Pa.1947, 73 F.Supp. 409. Consideration of the statute seems inescapable and upon this point the litigants are in agreement.[6]

In addition to urging the non-constitutionality of the statute, the plaintiff claims that in any event the Act, or alternatively, the particular orders in question, should not be applied to royalties due before January 1, 1943, the date mentioned in the orders. This argument is made, first, as a matter of what the plaintiff regards as the proper interpretation of the statute, and, second, an application of the doctrine of res judicata. This phase of the case we turn to first.

### Res Judicata and the Interpretation of the Orders Issued Pursuant to the Act.

The plaintiff presses his res judicata point in conjunction with his contention that the orders issued under the Act were by their terms prospective only, and that their intent was not to affect royalties which accrued before January 1, 1943. To understand Coffman's point it will be necessary to relate in greater detail the progress of this lawsuit as it worked its way to final disposition in the District Court. Among the items which made up the claim for royalties due under the terms of the license agreement was 6% of "the licensee's net selling price" on the cartridges manufactured to fill a certain Navy contract. There had been an agreement which reduced the royalties on the manufactured articles to fulfill that particular contract but plaintiff claimed that a failure to observe its conditions made the full 6% payable. When the defendant answered this part of the complaint it admitted that royalties of 3% were due on the cartridges manufactured under the particular Navy contract. As previously stated, however, it also set up the defense of the Royalty Adjustment orders. The plaintiff moved for a summary judgment on part of the claim on the ground that the orders did not prohibit its payment. The motion was granted. The order and the pleadings, which are all we have in the way of a record on that aspect of the case, do not indicate the basis of the District Court's action. Federal Laboratories argues that its original answer was drawn in such a manner that it did not raise the Royalty Adjustment orders as a defense to that part of the claim. Coffman says it did, pointing out that the briefs and oral argument on the motion were concerned mainly with just that point. We do not need to resolve this controversy. Either way that proceeding did not preclude the District Court when the matter came to trial from holding that the orders applied to royalties due before they were issued. Our conclusion turns on subsections (a) and (d) of Rule 56 and subsections (a) and (b) of Rule 54, Federal Rules of Civil Procedure, 28 U.S.C.A., all of which are set out in the margin.[7]

Rule 54(b) provides for a final judgment upon one claim in a suit predicated upon two or more claims. It is clear, however,

6 Since this position called into question the constitutionality of the Act the United States filed a motion to intervene and it was, of course, granted. 50 Stat. 751 (1937), 28 U.S.C.A. § 401 [now § 2403]. The Government is a party in this Court as a result of such action in the District Court.

7 "Rule 54. Judgments; Costs
"(a) Definition; Form. 'Judgment' as used in these rules includes a decree and any order from which an appeal lies. A judgment shall not contain a recital of pleadings, the report of a master, or the record of prior proceedings.

"(b) Judgment at Various Stages. When more than one claim for relief is presented in an action, the court at any stage, upon a determination of the issues material to a particular claim and all counterclaims arising out of the transaction or occurrence which is the subject matter of the claim, may enter a judgment disposing of such claim. The judgment shall terminate the action with respect to the claim so disposed of and the action shall proceed as to the remaining claims. In case a separate judgment is so entered, the court by order may stay its enforcement until the entering of a

that there must be differing occurrences or transactions which form the bases of separate units of judicial action before such a judgment can be entered under that Rule.[8] They are not found here. The plaintiff's claim is for royalties alleged to be due him up to the dates set forth in his bill of complaint. The fact that this claim was divided into several parts in the findings of fact,[9] to determine the impact of the Act and orders thereunder on various segments of it,

does not make what is essentially a single claim into several claims arising out of wholly separate and distinct transactions or engagements. The claim, moreover, of which enforcement was being sought, was one for 6% royalties on a particular contract and at most only half of that amount was undisputed. Since the part does not become a separate cause of action a judgment could not be entered under Rule 54(b).[10]

---

subsequent judgment or judgments and may prescribe such conditions as are necessary to secure the benefit thereof to the party in whose favor the judgment is entered."

"Rule 56. Summary Judgment

"(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the pleading in answer thereto has been served, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof.

\* \* \* \* \* \*

"(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."

[8] Biggins v. Oltmer Iron Works, 7 Cir., 1946, 154 F.2d 214; Reeves v. Beardall, 1942, 316 U.S. 283, 62 S.Ct. 1085, 86 L.Ed. 1478.

[9] "14. If the Royalty Adjustment Act had not been passed, there would presently be due and owing to the plaintiff from the defendant, under the contract between the parties, royalties on starters which accrued during each of the following periods: the period from January 1, 1937, through October 30, 1942, the day previous to the day of enactment of the Royalty Adjustment Act; the period from the date of enactment of said Act

through December 31, 1942; as to Navy business, the period from January 1, 1943, through February 23, 1943, the day previous to the date of receipt by plaintiff of the Navy Department Royalty Adjustment Notice; as to Army business, the period from January 1, 1943, through March 2, 1943, the day previous to the date of receipt by plaintiff of the War Department Royalty Adjustment Notice; as to Navy business, the period from the date of receipt of the aforesaid Navy Department Notice through December 22, 1943, the day previous to the date of issuance of Navy Royalty Adjustment Order N-7; as to Army business, the period from the date of receipt of the aforesaid War Department Notice through December 17, 1947, the day previous to the issuance of War Department Royalty Adjustment Order W-9; as to Navy business, the period from the date of issuance of the aforesaid Navy Department Order N-7 through December 31, 1943; as to Army business, the period from the date of issuance of the aforesaid War Department Order W-9 through December 31, 1943; and the period from January 1, 1944, through December 31, 1944. Assuming the defendant's contention to be valid, that a commission of 25% was payable to Breeze Corporations, more than $8 per starter would nevertheless be due to plaintiff under the terms of the license agreement between plaintiff and defendant, except for the interposition of the Royalty Adjustment Act and the Orders made thereunder. As to this amount in excess of $8 per starter, which plaintiff claims for each of the above detailed periods, no defense has been interposed in this case except that which is based upon the Royalty Adjustment Act and Royalty Adjustment Orders N-7 and W-9.

By the Court

V"

[10] Biggins v. Oltmer Iron Works, 7 Cir., 1946, 154 F.2d 214; Leonard v. Socony-Vacuum Oil Co., 7 Cir., 1942, 130 F.2d 535; cf. Porter v. American

The other rule to be considered in this connection is Rule 56. That Rule covers summary judgment, that is, those situations in which a court can enter a judgment based on the pleadings and affidavits filed which indicate that a party is entitled to a judgment as a matter of law. We have examined subsection (a) of the Rule in the light of subsection (d) of the same Rule and agree with the Second and Seventh Circuits that the Rule "does not contemplate a summary judgment for a portion of a single claim in suit. Neither does any other rule of the Rules of Civil Procedure so contemplate, as far as we are aware. A partial summary judgment, as the instant one is termed, under the circumstances before us is a misnomer." Biggins v. Oltmer Iron Works, 7 Cir., 1946, 154 F.2d 214, 216; Audi Vision, Inc., v. RCA Mfg. Co., 2 Cir., 1943, 136 F.2d 621, 147 A.L.R. 574.

Subsection (d) simply provides for a method whereby the trial judge with the aid of counsel can point up the controverted issues. It is, moreover, similar to the pretrial procedure provided for in Rule 16 [11] and the matters determined in the issues so framed are not foreclosed in the sense that the judge cannot alter his conclusions. The action of interpreting the orders, therefore, did not become final for the purposes of appeal [12] and it did not have the effect of a final judgment. The court retained full power "to make one complete adjudication on all aspects of the case when the proper time arrive[d]." [13] That time was when the judgment in the whole proceeding was entered. Therefore, even if we accept the plaintiff's contention as to what was determined by the motion, the court was still free to alter its view as to interpretation of the orders at a later stage of the proceedings. Res judicata was not and is not applicable.

█ Upon the question of the interpretation of the orders, we agree with the trial judge that a reading of them shows an intent to prohibit the payment of royalties in excess of the amounts fixed thereby, even though the royalties accrued before the orders were issued. Previous to the issue of Royalty Adjustment orders Nos. W–9 and N–7 the heads of the departments herein involved gave a notice, as directed by § 1 of the Act, to the effect that no royalties unpaid on that date should thereafter be paid until further notice. About ten months later the orders which are the subject-matter of the present controversy were issued. Paragraphs 1 of those orders set a ceiling price on starters and stated that no royalties were payable on the cartridges.

Plaintiff's main support for non-applicability to pre-1943 royalties is contained in the phrase " * * * but not to exceed the sum of Fifty Thousand ($50,000) Dollars to be paid to Licensor in each calendar year commencing January 1, 1943, in respect of starters sold to or for the War Department and Navy Department, added together." The date mentioned therein is the date on which the fifty thousand dollar limitation becomes effective. But it is not the date marking the beginning of regulation of the maximum amount the patent owner could receive as royalties. The intent to make the orders retroactive is evident from provisions contained in paragraphs 2 when the rates given in paragraphs 1 are permitted to be paid by the licensee "on account of any manufacture, use, etc. * * * heretofore occurred or hereafter occurring." Furthermore, in paragraphs 3 the licensee is directed to pay

Tobacco Co., D.C.S.D.N.Y.1946, 7 F.R.D. 103.

[11] "Rule 54(a) defines 'judgment' as including a decree and 'any order from which an appeal lies.' Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary 'judgment' is not a final judgment, and, therefore, that it is not appealable * * *. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Amendments to Rules of Civil Procedure for the District Courts of the United States with Report Thereon. 80th Cong. 1st Sess. House Doc. No. 473, p. 118.

[12] Russell v. Barnes Foundation, 3 Cir., 1943, 136 F.2d 654; see Moore, Federal Practice § 56.09 (Supp.1947).

[13] Audi Vision, Inc., v. RCA Mfg. Co., 2 Cir., 1943, 136 F.2d 621, 625, 147 A.L.R. 574.

over to the War Department all royalties due but unpaid to the licensor on "the effective date of said notice, * * * on account of any manufacture, use * * * for the War Department or the Navy Department heretofore occurred or hereafter occurring * * *." That the heads of the Navy and War Departments had the power to issue such an order is clear from the Act's legislative history [14] and our previous pronouncement on the validity and coverage of this Act.[15]

### Constitutionality of the Act.

On behalf of Coffman, the licensor, a vigorous, learned, and carefully annotated argument has been made attacking the constitutionality of the Royalty Adjustment Act. We think that a short answer can be made to the constitutional argument at this stage of the litigation, and that we could safely rest the decision upon it.

This Royalty Adjustment Act, as we explained in the Timken case, provides that if the patent owner is not satisfied with the amount which the designated administrative official in the War or Navy Department allows as royalty on his patent when used in Government work, he can go to the Court of Claims and sue for whatever more he thinks himself entitled to. The statute says that the Court of Claims shall award him such additional sum, if any, as will give him just compensation "taking into account the conditions of wartime production". The argument for Coffman, unlike the argument made to us in the Timken case, does not claim that the diverting of litigation into the Court of Claims is, in itself, unconstitutional. What is objected to on Coffman's account is the provision "taking into account the conditions of wartime production." This, the argument runs, loads the Court of Claims litigation with an unconstitutional provision. Why the limitation is supposedly unconstitutional is discussed below.

The answer which can be made here is that we have no way of knowing ahead of time what disposition the Court of Claims will make in Coffman's case or any other. We can conceive a case where conditions of wartime production might, in fairness, require adherence to the original license terms. Possibly a case may exist where conditions of wartime production might call for more than the price stipulated in the license agreement. Until the patentee sees what the Court of Claims is going to give him, we do not see how he is in a position to say that his wings are unconstitutionally clipped.

On this basis, therefore, we could properly, we think, affirm the decision of the Court below. But counsel for the appellant has in complete good faith argued the case on a wider basis. As he will undoubtedly seek review of our action in the Supreme Court, it is only fair to consider the argument on as wide a basis as that on which it was made.

■ Coffman contends, first, that the Government has taken from him a right to receive money, a taking not justified under any power of Congress. Second, he says that even if a taking may be had, the only fair compensation for it consists of the money value of his contract right measured by the price obtainable on assignment to another private person, and this must include the value attributable to wartime Government requirements. The core of the controversy, then, is whether the United States in pursuance of its war power, can constitutionally take Coffman's interest in the patent, or the parts of that interest necessary for the nation's wartime procurement program; if so, whether a necessary element of just compensation under the Fifth Amendment is the increase in value of Coffman's interest attributable to Government purchases. Discussion of these issues necessarily harrows ground already broken by our decision in the Timken case.

Under the Act of 1910 [16] as amended in 1918,[17] the use of a patented invention by or for the United States without license

---

[14] See Hearings, House Committee on Patents, on H.R. 7620 (77th Cong., 2d Sess.) p. 2; Sen.Rep. No. 1640 on S. 2794 (77th Cong., 2d Sess.) pp. 2, 6–7.

[15] Timken-Detroit Axle Co. v. Alma Motor Co., 3 Cir., 1944, 144 F.2d 714, judgment vacated and case remanded on other grounds 1946, 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128.

[16] 36 Stat. 851, 35 U.S.C.A. § 68 [1948 Judicial Code. 28 U.S.C.A. § 1498].

[17] 40 Stat. 705, 35 U.S.C.A. § 68 [1948 Judicial Code, 28 U.S.C.A. § 1498].

from the owner could not be enjoined nor could suit be maintained against the infringing agent. The patentee was given a remedy for recovery of compensation against the United States in the Court of Claims. The constitutionality of these Acts has been upheld. Crozier v. Fried Krupp Aktiengesellschaft, 1912, 224 U.S. 290, 307, 32 S.Ct. 488, 56 L.Ed. 771; Richmond Screw Anchor Co. v. United States, 1928, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303. This legislation was enacted primarily to prevent the threat of injunction from impeding the supply of war goods. The decisions upholding it establish clearly, however, the validity of the exercise of the power of eminent domain in aid of the war power in the patent field and the method of fixing just compensation by suit against the United States in the Court of Claims. If an effort to hold down the cost of war materials necessary to total war effort is a valid purpose within the war power, as we believe it is, the Act of 1910 may clearly be invoked to implement that purpose. License agreements attached to patents appear to create no additional obstruction to the exercise of that power.

The breadth of the war power needs even less exposition today than it did at the time of the Timken case in the light both of the recent decisions of the Supreme Court and the exposition of the war power which is found in the opinions. The war power extends across the full breadth of the economic life of the nation, justifying price and rent control,[18] and renegotiation of contracts for the purpose of recapturing excessive profits.[19] Legislation purporting to minimize the cost of war by securing the necessary materials at reasonable prices is not less a part of the general war effort than the procurement of goods of war themselves. The subject-matter and purpose of the Royalty Adjustment Act are therefore clearly within the war power of Congress.

■ The Act itself, pertinent provisions of which are printed in the margin,[20] is

---

[18] Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892.

[19] Lichter v. United States, 1948, 334 U. S. 742, 68 S.Ct. 1294.

[20] Royalty Adjustment Act, 56 Stat. 1013, 35 U.S.C.A. §§ 89, 90 and 92.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, to aid in the successful prosecution of the War, whenever an invention, whether patented or unpatented, shall be manufactured, used, sold, or otherwise disposed of for the United States, with license from the owner thereof or anyone having the right to grant licenses thereunder, and such license includes provisions for the payment of royalties the rates or amounts of which are believed to be unreasonable or excessive by the head of the department or agency of the Government which has ordered such manufacture, use, sale, or other disposition, the head of the department or agency of the Government concerned shall give written notice of such fact to the licensor and to the licensee. Within a reasonable time after the effective date of said notice, in no event less than ten days, the head of the department or agency of the Government concerned, shall by order fix and specify such rates or amounts of royalties, if any, as he shall determine are fair and just, taking into account the conditions of wartime production, and shall authorize the payment thereof by the licensee to the licensor on account of such manufacture, use, sale, or other disposition: Provided, however, That the licensee or licensor, if he so requests within ten days from and after the effective date of said notice, may within thirty days from the date of such request present in writing or in person any facts or circumstances which may, in his opinion, have a bearing upon the rates or amounts of royalties, if any, to be determined, fixed and specified as aforesaid, and any order fixing and specifying the rates and amounts of royalties shall be issued within a reasonable time after such presentation. Such licensee shall not after the effective date of said notice pay to the licensor, nor charge directly or indirectly to the United States a royalty, if any, in excess of that specified in said order on account of such manufacture, use, sale, or other disposition. The licensor shall not have any remedy by way of suit, set-off, or other legal action against the licensee for the payment of any additional royalty remaining unpaid, or damages for breach of contract or otherwise, but such licensor's sole and exclusive remedy, except as to the recovery of royalties fixed in said order, shall be as provided in section 2

part of the pattern of legislation enacted to facilitate procurement of war goods and minimize the cost of waging the war. It extends to inventions manufactured under license what its precursor, the Act of 1910, provided with respect to unlicensed inventions. Its new feature permits the Government to use the licensee as its manufacturing agent, instead of itself appropriating the patent and using a stranger to the patentee as manufacturer, as the 1910 Act would permit. We may consider as authoritatively established by the earlier legislation and decisions thereunder that the Government may constitutionally appropriate a patent and provide the patentee a remedy for compensation by suit in the Court of Claims. Plaintiff's argument against constitutionality is thus concluded by the earlier authorities unless a new element appears in the present litigation.

The new element suggested is the license agreement upon which Coffman bases his contention that a pure right to receive money has been taken. Licensor is entitled to a fixed number of dollars per unit from licensee, and if licensee manufactures a certain number of units for any purchaser, it is Coffman's view that a sum of money is due him and that the Government has taken away that sum. For that money right he insists that dollar-for-dollar compensation is the only constitutional substitute.

■ The argument fails upon consideration of the nature of a patent and the application of the 1910 statute to a situation not involving a license agreement. Patents are monopolies. Under federal protection the owner may exclude any prospective user, including the Government. He may set his own price for permissive use. If he sets a clearly exorbitant price for its use— say $1,000,000 per starter unit—and the Government in wartime appropriates the patent for war use under the Act of 1910, has the Government taken merely a right to receive money? The right is as clearly reducible to a claim for money as if it had been determined by private agreement between a patentee and a third party licensee, and the determination of the price rests on the same monopoly base in either instance.

■ Thus Coffman makes no new argument against the Act of 1942 that does not apply with equal force to the Act of 1910. If under the latter statute patent rights may be constitutionally appropriated by the Government, it is indeed difficult to see how private arrangements between the patentee and third parties can render the taking unconstitutional if covered by statute. Nor does any reason to contradict the authorities appear to us. The power of the people of the United States to procure war goods at reasonable prices cannot be subject to such a restriction, and the taking is clearly constitutional.

■ Once the dollar-for-dollar argument is disposed of, the confusion between the validity of the taking and the measure of just compensation largely disappears.

hereof. Written notice as provided herein shall be mailed to the last known address of the licensor and licensee and shall be effective upon receipt or five days after the mailing thereof, whichever date is the earlier.

"Sec. 2. Any licensor aggrieved by any order issued pursuant to section 1 hereof, fixing and specifying the maximum rates or amounts of royalties under a license issued by him, may institute suit against the United States in the Court of Claims, or in the District Courts of the United States insofar as such courts may have concurrent jurisdiction with the Court of Claims, to recover such sum, if any, as, when added to the royalties fixed and specified in such order, shall constitute fair and just compensation to the licensor for the manufacture, use, sale, or other disposition of the licensed invention for the United States, taking into account the conditions of wartime production. In any such suit the United States may avail itself of any and all defenses, general or special, that might be pleaded by a defendant in an action for infringement as set forth in title sixty of the Revised Statutes, or otherwise.

* * * * * *

"Sec. 4. Whenever a reduction in the rates or amounts of royalties is effected by order, pursuant to section 1 hereof, or by compromise or settlement, pursuant to section 3 hereof, such reduction shall inure to the benefit of the Government by way of a corresponding reduction in the contract price to be paid directly or indirectly for such manufacture, use, sale, or other disposition of such invention, or by way of refund if already paid to the licensee."

No pure money right was taken. What was taken was that part of the licensor's rights under his patent which was needed by the nation to wage war. The right to exclude the Government was taken; accrued and unpaid royalties on items for Government use, which were determined to be excessive, were also taken. The patentee-licensor was still entitled to be paid what was determined to· be a reasonable amount and to sue in the Court of Claims for whatever more he thought he ought to get. And he also retained his full contract rights on units manufactured for customers other than the United States. The fact that there was, practically speaking, no civilian market, may indicate the emptiness of the remaining rights in wartime; but it also illustrates graphically just how artificial was the market upon which the patentee relies to establish a measure of just compensation.

The Fifth Amendment does not require that the royalties specified in the license agreement be the measure of just compensation. It is abundantly clear that compensation for appropriation of private property by the Government is measured by the value of the property at the time of the taking [21] and exclusive of accretions to value imparted by the taking.[22] As we pointed out in Timken, the license rates which were fair enough on a peacetime production scale became unduly high when the demand was increased many fold by the requirements for global war. The enormous increase in value of goods measured by normal standards of supply and demand can hardly obtain as a measure of just compensation when the Goverment is the only customer and the nation is engaged in total war.

 On the constitutionality of applying the Act to royalties accrued but unpaid at the time of the giving of notice to the patentee, we can add little to what we said in Timken.[23] The subordination of private interests to a proper exercise of Governmental power is now well settled, even when no compensation is given for the adverse action. Express provision for compensation would seem to remove any remaining doubt. Similar retroactive provisions in the Renegotiation Act have been recently upheld by the Supreme Court and in very broad terms.[24]

The judgment of the District Court will be affirmed.

JAMES ALGER FEE, District Judge (concurring).

Concurrence in the foregoing opinion is absolute as to the result and as to the approach up to the point where it seems improperly to bind the plaintiff to accept the compensation tendered by the orders. This point need not be here settled.

Determination of a cause should not be based on constitutional grounds unless this course is unavoidable. Particularly, constitutional validity of a statute as a whole should not be considered where whatever vice there may be affects only the severable clause, "taking into account the conditions of wartime production."

The preemption of the position of the licensee as a property right defined in the

---

[21] Olson v. United States, 1934, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; Jacobs v. United States, 1933, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1.

[22] United States v. Miller, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; United States v. Rayno, 1 Cir., 1943, 136 F.2d 376; Cameron Development Co. v. United States, 5 Cir., 1944, 145 F.2d 209.

[23] 3 Cir., 1944, 144 F.2d 714, 718, 719.

[24] "* * * Congress limited the Renegotiation Act [50 U.S.C.A.Appendix, § 1191] to future contracts and to contracts already existing but pursuant to which final payments had not been made prior to the date of enactment of the original Act. These included contracts made directly with the Government and also subcontracts such as those here involved.

"We uphold the right of the Government to recover excessive profits on each of the contracts before us. This right exists as to such excessive profits whether they arose from contracts made before or after the passage of the Act. A contract is equally a war contract in either event and, if uncompleted to the extent that the final payment has not yet been made, the recovery of excessive profits derived from it may be authorized as has been done here." Lichter v. United States, 1948, 334 U.S. 742, 788, 789, 68 S.Ct. 1294, 1318.

Royalty Adjustment Act was valid. The expropriation of the status of licensee by virtue of orders W–9 and N–7 was and is an absolute defense for Federal Laboratories, Inc. There is a provision for the payment of some compensation to the patentee licensor. The sole problem presented is whether the amount of compensation is so limited by the clause in question that it can be no longer described as "just compensation." But that controversy is not within our competence. A valid provision leaves the amount of compensation to be fixed by the Court of Claims. If that Court, in accordance with or in disregard of the questioned clause, grant "just compensation," no constitutional right will have been infringed. Justice can be done to defendant by leaving the amount to be so settled, rather than by making final determination here. We need not go to the extent of needlessly prejudicing the interests of plaintiff and others similarly situated by holding this clause as well as the balance of the Act constitutionally founded and the recovery administratively determined before it is known what the Court of Claims, if not so shackled by our decision, would allow. On the firm ground that the seizure constitutes a defense in this case, I would stop and would not, as do the majority, plunge into the maelstrom of controversy about war powers of the executive.