# In the Matter of CONSTRUCTORA MAZA, INC., Debtor.

## FEDERAL INSURANCE CO., Plaintiff–Appellant,

v.

## HOUSING INVESTMENT CORP., Defendant–Appellee.

### Civ. No. 87–0081 (JAF).

United States District Court, D. Puerto Rico.

Oct. 27, 1988.

F. Castro Amy, San Juan, P.R., for plaintiff-appellant.

Jay A. García–Gregory, Fiddler, Gonzalez & Rodriguez, San Juan, P.R., for defendant-appellee.

## OPINION AND ORDER

FUSTE, District Judge.

This case involves an adversary proceeding between the surety for the construction of a condominium building and the lender of the owner of said building. The bankruptcy court, in a thirty-four page unpublished opinion, resolved all issues in favor of the lender (No. B–76–68), and the surety now appeals, invoking this court's jurisdiction under 28 U.S.C. § 158(a). For the reasons set forth below, we reverse in part and affirm in part.

### I.

*Factual and Procedural Background*

The history of this suit "is as muddled as the financial affairs of the debtor"[1] whose bankruptcy gave rise to the controversy. A brief description of the relevant facts and procedural background is therefore necessary.

Appellant Federal Insurance Company ("FIC") is a surety or bonding company that issued a performance and payment bond to Segovia Development Corporation ("Segovia"), the former owner of a residential construction project known as Segovia Condominium. FIC guaranteed to Segovia that the general contractor of Segovia Condominium, Constructora Maza, Inc. ("Maza"), would complete the project in a workmanlike manner and that all laborers, materialmen, and subcontractors would be duly paid. Financing for the project was obtained by Segovia through appellee Housing Investment Corporation ("HIC"). Segovia and HIC executed a loan agreement whereby HIC would advance funds directly to the contractor, all the while withholding a percentage of the amounts in a retainage fund to insure against incomplete or faulty workmanship.

Due to financial troubles, general contractor Maza was unable to complete the construction and, on March 2, 1976, it filed a Chapter XI bankruptcy proceeding as debtor in possession.[2] On June 10, 1976, the bankruptcy court allowed the rejection of Maza's contract with Segovia and ordered appellee HIC to keep the retainage fund, which amounts to $442,757.84, until further notice. (Stipulated Exh. # 3, in Bkcy. No. B–76–68). On December 14, 1979 and on February 1, 1980, HIC made deposits to the Clerk of the bankruptcy court for all but $84,982.61 of the retainages. (Stipulated Exh. # 22 and # 23). HIC set off this latter amount as just compensation, it claims, for loan advances it made for the completion of Segovia Condominium. Whether HIC has the right to do so is contested by FIC and forms the center of this controversy.

In addition to the foregoing, the following stipulated facts have bearing upon this case:

1. The [Segovia Condominium] project was completed pursuant to an agreement

---

1. *Federal Insurance Co. v. Constructora Maza, Inc.,* 500 F.Supp. 246, 247 n. 1 (D.P.R.1979).

2. Subsequently, the bankruptcy court named Jorge M. Guillermety as receiver to administer Maza's estate.

between plaintiff surety (Federal) and the owner (Segovia) dated May 12, 1976. Under the provisions of the third paragraph thereof, plaintiff surety paid the owner the total sum of $101,153.34 for the completion of the work covered thereby. And in compliance with the agreement, plaintiff surety also paid (1) $234,626.56 to subcontractors for completion work, (2) $334,276.06 to subcontractors for unpaid work performed prior to the termination of the contract with the general contractor, including retainages, and (3) $89,412.13 to materialmen unpaid by the general contractor.

2. During the progress of the completion of the project after the contractor's default, defendant Housing made loan advances to the owner in the total sum of $84,982.61 for the completion of the project which were used to pay for work under a plumbing subcontract with Hato Rey Plumbing Co. and an electrical subcontract with GLS Corp.

3. Pursuant to an agreement with the electrical subcontractor (GLS Corp.), the owner requested plaintiff and the latter issued drafts totalling $43,740.88 in satisfaction of the retainages and final payment due under said subcontract. One of the drafts for the sum of $9,000 issued to GLS and defendant Housing remains uncollected and is, therefore, due by the plaintiff. The others were paid to the payees.

4. On September 21, 1978, the plaintiff deposited with the Clerk of the Superior Court of Puerto Rico, San Juan Section, the balance of $62,395.82 due under the plumbing subcontract with Hato Rey Plumbing, in the case of *Luis Freire, Inc. v. Segovia Development Corp.*, Civil No. 77–4852, before said court. In that suit on August 22, 1980, the owner settled with the plumbing subcontractor and its assignee for $38,-895.82 the owner's claim of $53,350.64. This settlement was entered into with the consent of defendant Housing, who participated in the negotiations therefor and received the aforestated settlement sum of $38,895.82 from Segovia.

As for the tangled procedural history, this action was initially filed in bankruptcy court on September 7, 1976 as an effort by FIC to recover from HIC the *entirety* of the retainage fund, including the amount HIC seeks to retain as a setoff. Thereafter, other claims to this fund were made by Maza, its Receiver in Bankruptcy, and Banco de Ponce, as Maza's assignee. In October of 1978, the bankruptcy court held that it did not have summary jurisdiction over this proceeding and transferred the case to the civil docket of the U.S. District Court for the District of Puerto Rico.

At the district court, Judge Juan R. Torruella issued a series of orders, the significance of which will be discussed in greater detail below. On September 5, 1979, the court entered summary judgment for FIC, "declaring" that it had a superior right to the retainages in relation to Maza, its Receiver and Banco de Ponce. However, the Court entered no specific amount in favor of the plaintiff. Instead, the court instructed the bankruptcy court to

> examine the claims of codefendant Housing Investment, Inc. as to the sums disbursed for final completion of the project and set off any amounts as may be appropriate under the terms of the contracts involved.

Stipulated Exh. # 15 at 9–10.

At this point, FIC filed a "Motion for Clarification and Amendment of Decision and Order" in which it argued, essentially, the incorrectness of granting HIC a setoff right against the retainage fund awarded to FIC as surety. (Stipulated Exh. # 17). In an order dated November 19, 1979, Judge Torruella denied FIC's motion, reiterating his decision that HIC had a general entitlement to set off certain amounts provided that it could prove that such amounts were in fact advanced for the completion of the project. In essence, the court clarified that the "right to the funds rather than any specific amount was the limited scope of [its] consideration" and that it would leave the latter issue to the bankruptcy court. (Stipulated Exh. # 21).

In the meantime, Maza and its Receiver had appealed the district court's September 5, 1979 ruling to the First Circuit Court of Appeals. The First Circuit, however, found itself without jurisdiction to hear the

appeal at this time, construing FIC's "Motion for Clarification" as one to alter or amend judgement. Following Judge Torruella's denial of FIC's Motion for Clarification, Maza and its Receiver reinstated their appeal. FIC, on the other hand, did not appeal that portion of the order granting setoff rights to HIC. The First Circuit then affirmed the district court's determination of FIC's retainage rights with respect to Maza, the Receiver and Banco de Ponce. *See Segovia Development Corporation v. Constructora Maza, Inc,* 628 F.2d 724 (1st Cir.1980).

Back in bankruptcy court, FIC and HIC had been conducting discovery with respect to the exact amount HIC would be entitled to set off from the retainage fund. During such discovery, FIC uncovered an agreement dated September 28, 1977, whereby HIC had allegedly released Segovia of all claims in relation to loan agreements for the construction of Segovia Condominium. Arguing that the effect of this agreement should be to deny HIC *any* setoff right as a matter of law, FIC again put the issue before the district court in the form of a motion for summary judgement. Upon consideration of his two previous orders, Judge Torruella denied FIC's motion "without prejudice that the arguments presented therein may be raised before the bankruptcy court when this matter is presented before said court as provided in our November 19, 1979 Order *in fine.*" (Stipulated Exh. # 33).

At this juncture, in ping-pong ball fashion, the issue concerning HIC's setoff rights bounced back to the bankruptcy court. On the basis of stipulated facts, record and documents, the bankruptcy judge issued a decision allowing HIC to set off $84,982.61 from the retainage funds and denying FIC's request for interest and attorney's fees. That decision is now here before us on appeal.

## II.

### Appellant's Claim Not Barred By Res Judicata

■ The first issue is whether this court is barred on *res judicata* principles from entertaining the question of HIC's general setoff rights. The bankruptcy court expressly based its decision on *res judicata* preclusion (*see* Opinion at 24), although it nevertheless entertained some of FIC's arguments on the merits.

FIC seeks to avoid any *res judicata* effect, first, by arguing that the scope of the district court's original assignment to the bankruptcy court was broad enough to allow consideration of any and all arguments against HIC's setoff right. The simple language of the September 15, 1979 order, however, reveals a much narrower focus. Here the bankruptcy court is instructed to "examine the claims of codefendant Housing Investment Inc. as to sums disbursed for final completion of the project and setoffs [sic] any amounts as may be appropriate under the terms of the contracts involved." (Stipulated Exh. # 16). We interpret this language as a request for the bankruptcy court to conduct a fact finding of the sums disbursed, with the larger issue of HIC's general right to off-set any such sums being already decided by the district court. That FIC originally so interpreted this Order is apparent in its Motion for Clarification, in which it asks the Court to alter its "provision allowing defendant Housing to set off from the retainages the sums it may have advanced or loaned for the final completion of the project." (Stipulated Exh. # 17 at 2).

Nor does the district court's subsequent clarification of its previous order extend the scope of the bankruptcy court's assigned task. On the contrary, it ruled that

The lender under the contract would have been entitled to set off from funds owed to the contractor those amounts spent on remedying defects. Subrogation compels that the surety also be subject to this condition. If, as the surety asserts, there are no defects, or if the same have been remedied, then it would be entitled to the full amount of the funds. If, on the other hand, there were defects or vices in the construction and the lender somehow advanced or paid for their reparation for the benefit of the owner, then the surety, just like the con-

tractor, would have to suffer the difference. Just what the true situation was could not be determined from the record before us at the time of the Decision and Order. It cannot be determined from the record as it stands now. (Stipulated Exh. #21 at 3–4) (footnotes omitted).

This language clearly establishes what the bankruptcy court was assigned to do: namely, subtract from the retainage funds owed to appellant FIC any amount found to have been "somehow advanced or paid" by HIC to remedy defects in the construction. At the same time, the obvious import of the passage is that for the time being at least the general right to set off has been decided by the district court. At the very least, then, the bankruptcy court was entitled to take these directions as the law of the case and to treat them with appropriate deference.[3]

Appellee HIC claims that this law of the case hardened into *res judicata* when FIC failed to cross appeal that portion of the district court's judgment relating to HIC's setoff rights. Appellee cites *Cochran v. M & M Transp. Co.*, 110 F.2d 519 (1st Cir. 1940), to the effect that where a litigant is aggrieved in part by a judgment in his favor, he must appeal or cross appeal that part or else that judgement becomes *res judicata* as to the issues decided against him. *Cochran*, 110 F.2d at 523, and cases cited therein. We believe, however, that *Cochran* does not control the case at bar. *Cochran* dealt with the consequences of a plaintiff's failure to cross appeal adverse judgments on three counts at the same time defendant appealed an entered judgment for the plaintiff on the fourth count. Significantly, the court held that because the relief sought by plaintiff was identical as to all four counts, he was not aggrieved by the adverse judgments and, thus, did not have to appeal them. *Cochran*, 110 F.2d at 522. Therefore, the proposition

cited by HIC is *dictum* in that it was not essential to the decision in that case.

More importantly, the appeal taken in *Cochran* came after a jury verdict on the merits in an action between a single plaintiff and a single defendant. Here, HIC seeks to apply *res judicata* preclusion to a summary judgment concerning the respective rights of multiple parties to a single retainage fund. That portion of the judgment concerning HIC's setoff rights left significant issues to be tried to the bankruptcy court and is, thus, analogous to interlocutory partial adjudications under Fed.R.Civ.P. 56(c) and (d). *See* 6 J. Moore, *Moore's Federal Practice* ¶ 56.20[3.—4] (2d ed. 1988). *See also Coffman v. Federal Laboratories*, 171 F.2d 94 (3rd Cir.1948). Indeed, it was entirely possible that the bankruptcy court, following the district court's directions to the letter, could determine that the amount HIC was entitled to set off was zero. With such a possibility left open it is hard to say that this portion of the district court's order was sufficiently firm as to be ripe for appeal.

The fact that the First Circuit heard appeal on that portion of the order relating to Maza and its Receiver does not alter this conclusion. With respect to these parties, the district court found that no further proceedings were necessary. This is in sharp contrast with its treatment of HIC's setoff rights, which were found contingent on the findings of the bankruptcy court. Therefore, there is no reason why all the parties to this action needed to stay on the same path. Contrary to what appellee argues, FIC is not needlessly engaged in claim splitting; rather, the district court itself decided that the most expedient means of handling this case was to send the setoff issue to the bankruptcy court.

Any doubt that the district court considered its order relating to HIC's setoff rights as interlocutory and subject to revision is put to rest by its subsequent denial

---

**3.** Because the district court received this case as a transfer and not as an appeal, its "remand" to the bankruptcy court was not that of an appellate court to a trial court. *See* Stipulated Exhibit #21, n. 1. Rather, the two courts were working in tandem in what amounted to a bifurcated proceeding. Therefore, unless it is found to be *res judicata* (see below), the law of the case as established by the district court is reviewable here along with the findings of the bankruptcy court.

of FIC's motion for summary judgment, in which it allowed FIC to raise with the bankruptcy court the argument relating to HIC's alleged release of its debtor Segovia. Here, the district court effectively revised its previous order by allowing FIC to raise an argument that challenged HIC's right to set off *per se*. There obviously can be no finality of judgment sufficient for *res judicata* purposes when the bankruptcy court has been instructed (1) to engage in a factual determination and, now (2) to entertain an argument that challenges the district court's initial decision itself.

We therefore hold that the district court's order respecting HIC's setoff rights is not entitled to *res judicata* effect and that this court may properly hear any and all arguments concerning this matter.

## III.

### HIC's Setoff Rights

■ Pursuant to Rule 8013 of the Bankruptcy Rules, this court will apply the "clearly erroneous standard" as to findings of fact. We do, however, exercise *de novo* review over conclusions of law.

As bonded surety, appellant FIC has never denied its obligation to pay for the completion of Segovia Condominium and to pay all subcontractors left unpaid when the general contractor Maza declared bankruptcy. It was in recognition of this obligation that FIC entered into a contract with Segovia on May 12, 1976 for the completion of the project. (*See* Stipulated Fact # 1). The terms of this agreement provided that FIC would forward progress payments, less retainages for faulty workmanship, directly to subcontractors pursuant to certifications approved by Segovia. FIC did in fact forward over half a million dollars to various subcontractors and materialmen. (*See* Stipulated Fact # 1). These payments to subcontractors included disbursements to the plumbing subcontractor (Hato Rey Plumbing) totalling $87,559.04, as well as to the electrical subcontractor (GLS) totalling $22,970.88. (*See* Stipulated Exh. # 7, affidavit of Eduardo Alonso).

In spite of having made this arrangement with FIC, Segovia also obtained additional funds totalling $84,982.61 in the form of "loan advances" from HIC. This amount was apparently forwarded by HIC to various third-party subcontractors and materialmen to perform work that Hato Rey Plumbing and GLS should have done but did not. (*See* Stipulated Fact # 2). HIC claims that it is entitled to set off these funds from the retainages it once held.

The bankruptcy court agreed with HIC and upheld HIC's setoff right on two related theories. First, the court found that HIC, having paid a debt owed by FIC for the benefit of Segovia, was subrogated as to the rights of either Segovia or the payees as against FIC. Second, the court found that HIC's claim falls squarely within Article 1112 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3162. That provision reads as follows:

Any person [HIC], whether he has an interest or not in the fulfillment of the obligation, and whether the debtor [FIC] knows and approves it or is not aware thereof, can make the payment.

The person paying for the account of another may recover from the debtor what he may have paid, unless he has done it against his express will.

In such case he can only recover from the debtor insofar as the payment has been useful to him.

According to the bankruptcy court, the payments made by HIC released FIC of its obligation as surety, "and it is only logical, equitable and just that HIC should be reimbursed for the benefit bestowed on FIC through the set off of the amounts paid from the retainages it held." (Opinion at 16).

In reaching this conclusion, the bankruptcy court made a key factual determination which is implicitly challenged in appellant's brief, namely, that these monies technically were not *lent* to Segovia for the payment of subcontractors, materialmen or laborers, but rather that HIC *paid* those subcontractors, materialmen, and laborers directly. (Opinion at 18).

The legal consequences of this distinction are important insofar as they determine who has the primary right to repayment. If, as found by the bankruptcy court, these expenditures did not arise out of any lender/borrower relationship, but rather through a separate arrangement "consented to by FIC" in which HIC made the payments directly, then we agree that HIC has a right "separate and independent" from the loan agreement to set off these funds. (Opinion at 20). If, on the other hand, HIC lent this money to Segovia, then it is through Segovia that HIC must obtain its right to repayment, as "lenders cannot be subrogated to the rights of the workmen," *Glens Falls Indemnity Co. v. Lluch*, 61 P.R.R. 822, 829 (1943), or, in this case, to the substitute subcontractors and materialmen. In such case, if Segovia's debt to HIC has been somehow extinguished, either through repayment or release, then HIC obviously has no claim to take elsewhere. Moreover, if Segovia as borrower has sought and received payment from FIC for the expenditures *it* made using money *on loan* from HIC, then HIC as lender can hardly come looking to FIC for an additional repayment of these same funds.

In its opinion, the bankruptcy court makes much of two sworn statements made by Mr. Otto Brito, Vice–President of Segovia, in order to establish the "genesis" of the payments made by HIC. In essence, Mr. Brito states that

upon the *verbal suggestion* of representatives of Federal, Segovia contracted third parties to perform works covered by the subcontracts between Maza and GLS and Hato Rey Plumbing who had defaulted, and thereupon submitted to Housing the certifications for payment mentioned in paragraph 5 of the Motion in Opposition to Motion for Summary Judgment to which this Sworn Statement

is appended as Exhibit "A"; Housing paid said certifications.

*See* Stipulated Exh. # 8; (emphasis supplied).

From the above, the bankruptcy court establishes that these payments did not have their source in any "loan agreement" between HIC and Segovia, but rather in an independent verbal "arrangement consented to by FIC." Opinion at 20. Moreover, Mr. Brito's statements constitute the only evidence in the record of the existence of such an "arrangement."

We feel the bankruptcy court failed to adequately balance this statement against the bulk of evidence to the contrary. In the first place, we are disturbed by that court's insistence that this account was "uncontested" by FIC. The record shows, contrary to the express finding of the bankruptcy court, that Francisco Castro Amy, to whom appellee attributes the "verbal suggestion," denied approving any funding arrangement other than that already worked out in the May 12, 1976 agreement between Segovia and FIC. According to his deposition, FIC had "nothing to do with the loans that [HIC] made to Segovia. [HIC] never requested us authorization to make any loans to Segovia. Housing never did that so [FIC] did not intervene with monies that [HIC] forwarded to Segovia." (Stipulated Evidence # 24 at 30). We feel, then, that the bankruptcy court's characterization of Mr. Brito's statement as uncontroverted is clearly erroneous.[4]

We have, then, contradictory statements made by interested parties relating to the "genesis" of the payments made by HIC. Obviously, such characterizations in the course of litigation are bound to be self-serving and it is more instructive to look to the behavior of the parties.

Looking through the record, it is clear that both Segovia and HIC behaved as though it was the former who was owed compensation for the expenditures in ques-

---

**4.** *See* Stipulated Evidence # 24 at 22, 30. The bankruptcy court found that Mr. Castro Amy did not deny making an authorization to HIC, but "only clarif[ied] that its contract with HIC was in writing." Opinion at 15. Here the Bankruptcy Court grossly misconstrues Mr. Castro Amy's remarks. The "writing" referred to at page 24 of his deposition specifically refers to the May 12, 1976 agreement between Segovia and FIC, *not* to any "contract," written or otherwise, with HIC. Mr. Castro Amy categorically denies any such agreement with HIC.

tion. We find the transactions alluded to in the so-called release agreement of September 28, 1977 particularly revealing. While its exact scope is contested by the parties, this agreement and deed of transfer constitutes a sale to Chase Manhattan Bank of the Segovia Condominium, as well as a release of certain debts to Chase and HIC on account of loan advances for the construction and completion of said building. (*See* Stipulated Evidence # 8–11). Incorporated into this agreement is an "Exhibit F" which, *inter alia,* refers to accounts of Segovia with the plumbing and electrical subcontractors. Exhibit F also details a plan by which Segovia, with HIC's consent, would secure payment for funds advanced by Segovia/HIC under these subcontracts. (*See* Stipulated Evidence # 9).

As to the plumbing subcontract, Segovia and HIC stated and agreed to the following:

a) Hato Rey Plumbing did not comply in full with its contract. This attitude on their part forced Segovia after officially notifying Hato Rey Plumbing to carry on with the work in order to finish the project. Besides, Segovia Development Corp. have been informed about legal claims commenced by Anibal Arzuaga, Inc. and Luis Freire, Inc. for money owed to them by Hato Rey Plumbing. In this case, for the facts heretofore stated *Segovia Development Corp. requested from Federal Insurance Company to deposit in court the balance of the retainage of Hato Rey Plumbing which amounts to $66,613.20. This will enable each of the creditors, including Segovia Development Corp. and HIC to collect the money owed to them by means of their respective or individual legal claims. Segovia and HIC claim will amount to the cost of the work performed by Segovia on behalf of Hato Rey Plumbing.* Attached is a copy of Civil Case # 77–4852, a claim of Luis Freire, Inc. against Segovia Development Corp. for $6,393.58. This amount represents part of the cost incurred by Segovia in performing work on behalf of Hato Rey Plumbing and should be recovered from the above said deposit. (Emphasis supplied).

It is clear from the above that "the cost of the work performed by Segovia on behalf of Hato Rey Plumbing," which constitutes Segovia's and HIC's claims and amounted to $53,350.64, was to be recovered from the deposit requested of FIC. Segovia made this request through a letter dated August 22, 1977 to FIC's attorney (*See* Stipulated Evidence # 13), and on September 21, 1978, FIC in fact deposited with the Clerk of the Superior Court of Puerto Rico the sum of $62,395.82, representing the balance of retainages due under the plumbing subcontract. (*See* Stipulated Fact # 4). This amount was to be held by the court for the satisfaction of claims in the then pending civil case, *Luis Freire, Inc. v. Segovia Dev. Corp.*

That suit was brought by Hato Rey Plumbing and its assignee to recover the balance due the latter under the plumbing subcontract. Segovia defended this suit by alleging the same $53,350.64 that Segovia/HIC spent to perform work that Hato Rey Plumbing should have done. On August 28, 1980 Segovia settled its $53,350.64 claim against the funds deposited for $38,395.82. This settlement was entered into with the consent of HIC, who participated in the negotiations and in fact *received* the $38,395.82 from Segovia. (*See* Stipulated Fact # 4; Stipulated Evidence # 12–18).

It would appear, then, that at the very least the $53,395.82 (*see* Stipulated Exh. # 8 at 2) claimed by HIC as its expenditures on the plumbing subcontract must be reduced by the $38,395.82 it received from Segovia, for to do otherwise would allow HIC to be paid for the same debt twice. Nevertheless, the bankruptcy court awarded HIC a setoff right in the full amount. Therefore, we conclude that the determination of the amount was clearly erroneous. Our finding is bolstered by no less than HIC's memorandum of law to the bankruptcy court dated July 22, 1982, where it states:

From civil case number 77–4852(806); *Luis Freyre, Inc. v. Segovia Develop-*

*ment Corp.,* Housing accepts having received the amount of $38,895.82, which should be reduced from the amount of $84,982.61 presently held by it. Consequently, the amount which Housing claims as setoff for the disbursements it made is the sum of $46,086.79.[5]

The next question, then, is whether HIC is entitled to set off the difference between what it received from the settlement and the $53,395.82 it claims it disbursed under the plumbing subcontract. The bankruptcy court, without elaboration, said that any amount recovered under the "Exhibit F" plan was merely a "best effort[ ] to recover the money in question" and could not "affect HIC's rights to set off such sums from the retainage fund to the extent they could not be *fully* recovered" through such methods. (*See* Opinion at 21; n. 11).

We cannot attach so little significance to the proceedings described in Exhibit F. HIC claims that in making the payments for Segovia's benefit it is subrogated as to Segovia's primary right to recover these funds. However, in its release agreement with Segovia and throughout the proceedings discussed above, HIC in effect allowed Segovia to exercise this primary right while HIC adopted the posture of the lender waiting to be repaid by its client. Once HIC consented to the settlement and accepted payment of $38,895.82 from Segovia, it is estopped from in effect claiming that *it* and not Segovia is primarily entitled to compensation for the expenditures. *See, e.g., Int. General Electric v. Concrete Builders,* 104 D.P.R. 871, 874–78 (1976) (a party to a contract cannot assume a contradictory position to the one it first assumed creating a legal situation upon which a third party relied, acting upon such reliance). Thus, HIC's rights can be only as extensive as Segovia's, and the latter's have been extinguished with the settlement agreement HIC consented to. HIC must, therefore, look exclusively to its borrower for repayment.

HIC argues that such a disposition narrows FIC's obligation as surety from one of making all payments for the completion of the project to that of merely depositing the retainage funds. This argument might have some weight if the amount HIC/Segovia spent on substitute plumbing subcontractors was greater than the retainage fund withheld from Hato Rey Plumbing. If, for instance, some party were forced to spend $100,000 on plumbing work, FIC perhaps could not come clean simply by depositing the $62,395.82 it held in retainages from Hato Rey Plumbing. But that is not the case here. The $53,350.64 claimed by Segovia was less than the retainage fund deposited by FIC. That Segovia, and by proxy HIC, settled for less than the full amount of the claim does not detract from the fact that FIC made payment of funds sufficient to cover all work done under the plumbing subcontract. FIC provided those funds once, and the fact that part of them may be lost like a pea in a shell game conducted by appellee and Segovia does not mean that FIC should have to pay again.

This court, therefore, holds that HIC is not entitled to set off any amounts it claims to have forwarded under the plumbing subcontract because these amounts were paid by FIC and because HIC's borrower Segovia has already been duly compensated for these same claims.

Looking to HIC's claims to expenditures made under the electrical subcontract, we find a similar situation. Again we begin at Exhibit F of the release agreement dated September 28, 1977. Here it states that

b) Segovia Development Corp. with the approval of HIC agreed with GLS Corporation to the following:

1. Segovia Development Corp. will authorize Federal Insurance Co. to pay GLS Corporation the balance of its retainage.

2. GLS Corporation will commit herself to pay HIC out of the retainage the cost of the work performed in their behalf by

---

**5.** It is unclear to this court why after this concession by HIC the bankruptcy court found that HIC was entitled to set off the full sum of $84,982.61. Further, it is unclear why HIC today persists in asking for this full amount.

Segovia Development Corporation and certified by HIC.

3. GLS Corporation will provide $20,-000, one year term performance bond to guarantee the completion of the work pending.

4. GLS Corporation will release Segovia Development Corp. of any present and future claims on their part in relation with the work performed or to be performed by them in the Segovia Condominium.

*See* Stipulated Evidence # 9 at 4.

Subsequently, on November 3, 1977, Otto Brito, acting on behalf of Segovia, wrote the following to FIC:

I hereby request final payment to GLS Corporation, electrical subcontractor of Segovia Development Corporation, in the amount of $43,740.88 which is the balance of the retainage owed to them. Please verify this amount with Mr. Eduardo Alonso.

Based on a written agreement with GLS Corporation, the checks covering said disbursement of $43,740.88 should be issued as follows:

1) A check payable to GLS Corporation and Raigon Electric Corp., to pay services rendered by Manuel Fernández Mazaira, who has been hired by GLS Corp., amounting to $2,740.88.

2) A check payable to Housing Investment Corp., to reimburse them for payments they made in behalf of GLS Corp., totalling $9,000.00.

3) A check payable to GLS Corporation and Raigon Electric in the amount of $32,000.00.

*See* Stipulated Evidence # 19.

In accordance with this request, FIC issued drafts for the parties and amounts indicated, except that the draft for $9,000.00 was issued jointly to HIC and GLS.[6] FIC now claims that by doing so it is relieved of any further obligation to compensate HIC for expenditures it made under the electrical subcontract.

---

6. As stipulated by the parties, this draft was never collected and is, therefore, due by FIC.

Our analysis is similar to that regarding the plumbing subcontracts. First, it is manifest that Segovia is acting pursuant to its release agreement with HIC in asking FIC for "final payment" with respect to the electrical subcontract. Moreover, it is apparent that Segovia and HIC had agreed that the former would reimburse the latter through an arrangement previously worked out with GLS. Having agreed to be repaid in this manner, we find it incongruous for HIC to now be requesting additional repayment from the one party who indisputably upheld its end of this arrangement. Indeed, FIC complied by issuing the drafts requested. Having done so, it cannot again be subjected to this same claim.

■ Up to this point we have said nothing of the effect of the "release agreement" in its own right—that is, as a document that allegedly extinguishes any claim HIC might have against its borrower Segovia. If it is true that HIC released Segovia from repaying any amount HIC forwarded on its behalf, then HIC has no basis to look for these monies elsewhere.

The release in question is included in an agreement whereby Segovia sold to Chase the Segovia Condominium Building in exchange for the release of Segovia from certain loan obligations to HIC and Chase with respect to the building. Paragraph 6 of that agreement states as follows:

Chase and HIC covenant and agree with Borrower that Borrower is released as of the date of this Agreement from all personal liability with respect to the Promissory Notes and the Mortgage Notes and is also released from any obligation of payment or performance under the terms and conditions of the Mortgage and Loan Documents and HIC will not seek any deficiency judgment against Borrower in the event HIC chooses to exercise its rights under the Loan Documents, but rather that, with respect to the Borrower, HIC and HIC shall look solely to the Property and to the extent provided for herein, the Guarantors for the satisfac-

*See* Stipulated Fact # 3.

tion of the Mortgage and the payment of the Promissory Notes.

The bankruptcy court found that this release did not include the loan advances to Segovia corresponding to work under the plumbing and electrical subcontracts. Moreover, it found that the September 28, 1977 agreement "has nothing to do with the separate and independent right that HIC has to charge, deduct and collect from the retainages." (Opinion at 20). After carefully considering the entirety of the document, we cannot construe it so narrowly.[7]

In the first place, this agreement undeniably contemplates a release of Segovia's obligations under certain loan advancement agreements dated around 1973. There is nothing in the record, however, to indicate that these loan agreements were extinguished by Maza's filing of bankruptcy or by the May 12, 1976 agreement for the completion of the project between FIC and Segovia. On the contrary, the bankruptcy court in its June 10, 1976 Order authorized HIC "to make available to owner Segovia any and all unused fund [sic] in the construction loan of the Segovia project." (*See* Stipulated Exh. # 3 at 4).

Moreover, the very terms of the agreement specifically provide in its Exhibit F how the loan advances in question were to be reimbursed, namely: (1) by having FIC deposit in court the balance of the retainage of Hato Rey Plumbing so as to "enable each of the creditors, including Segovia Development Corp. and HIC to collect the money owed to them by means of their respective or individual claim;" and (2) by authorizing "Federal Insurance Co. to pay to GLS Corp. the balance of its retainages" with the commitment of GLS, the electrical subcontractor "to pay HIC out of the retainage the cost of the work performed in their behalf by Segovia Development Corporation and certified by HIC." (*See* Stipulated Evidence # 9). We cannot agree with appellee that this language was put into the agreement merely to describe the unbargained-for and non-binding "best ef-

forts" of the parties to obtain satisfaction of their claims. Rather, it is clear that Segovia was acting pursuant to what it had agreed when it requested drafts and deposits from HIC, with which the latter fully complied.

Finally, we believe that the bankruptcy court's contention that FIC lacks standing to invoke the release agreement between Segovia and HIC because FIC was not a party thereto fails to consider the relevance of that agreement with respect to its alleged right to set off. In order to assert such a right against the project's retainages, HIC must have a debt owed to it by its borrower Segovia. If through the aforestated agreement that debt was settled, then there is nothing else upon which HIC can assert a right to set off.

We, therefore, reverse the Order of the bankruptcy court allowing HIC to setoff the $84,982.61 from the retainages held.

## IV.

### Interest and Attorney's Fees

FIC also appeals the bankruptcy court's denial of its claim to interest and attorney's fees. However, we agree with the bankruptcy court that these claims are without merit. Therefore, that part of the judgement is affirmed.

■ FIC seeks to obtain interest not only on the $84,982.61 appellee seeks to set off, but on the balance of the retainage fund as well. It bases this claim on Article 1061 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3025. Moreover, FIC analogizes HIC's position in this case to that of a garnishee whose indebtedness has been attached by the creditor suing the garnishee's creditor. *See e.g., Rocafort v. Cantero*, 31 P.R.R. 484 (1923).

We believe that the effect of the bankruptcy court's June 10, 1976 order freezing disbursement of the retainage fund is fatal to FIC's claim. As the bankruptcy court correctly noted in its opinion, the interest contemplated by Article 1061 is not "inher-

---

7. We note that this court retains *de novo* review over the construction of contracts. *See e.g.,*

*Ram Construction Co., Inc. v. American States Ins. Co.*, 749 F.2d 1049 (3rd Cir.1984).

ently inseverable from the principal obligation, but is considered as an independent indemnity for damages, by way of penalty, for default in payment." *Rivera v. Crescioni,* 77 P.R.R. 43, 51 (1954). There can obviously be no "default" in payment until the obligation to pay arises. In the present case, there was no such obligation until the district court's order of September 5, 1979. Until then, HIC was bound by the June 10 order to refrain from disbursing the retainages "until further order of this court." Stipulated Exh. #3 at 4.

This is so even if, as appellant claims, HIC was a mere stakeholder with regard to all but the amount it claimed as a setoff. As HIC was bound by an order to keep the entirety of the retainage fund in its possession, this court is not going to penalize HIC for its compliance. If FIC objected to the June 10, 1976 order freezing disbursement of the retainage fund, it could have filed a motion to have this fund deposited with the court pending the outcome of this action. It chose not to do so, however, and merely filed a complaint with full knowledge that HIC *could not* transfer any amount of the fund without court authorization to do so.

FIC's claim to interest on the $84,982.61 is even more misplaced. HIC was no mere stakeholder as to this amount and actively claimed its right to a setoff at every turn in this litigation. Moreover, there is obviously no default in payment on HIC's part, as no court has denied HIC its setoff right until today.

As for FIC's claim to attorney's fees, we can only reiterate the bankruptcy court's findings. Although today we find for appellant and against appellee, we cannot conclude that HIC has been obstinate in defending this suit, especially in light of its factual and procedural complexity. *See e.g., Howard v. P.R. Aqueduct and Sewer Authority,* 744 F.2d 880, 885 (1st Cir.1984).

### V.

#### *Conclusion*

For all of the above-stated reasons, we hold that HIC was not entitled to set off

8. This holding is, of course, subject to FIC's issuing a new draft of $9,000.00 as was initially

$84,982.61 from the retainage fund it previously held with respect to the construction of Segovia Condominium.[8] This aspect of the bankruptcy court's Opinion is, therefore, REVERSED. However, we AFFIRM that portion of the Opinion denying to appellant its request for interest and attorney's fees.

IT IS SO ORDERED.

agreed pursuant to HIC's request for final payment on the electrical subcontract.